[L.A. No. 30380. In Bank. Dec. 29, 1975.]

COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS ANGELES, Plaintiff and Appellant, v. ARTHUR J. ABRAMS, Defendant and Appellant.

## Counsel

Eugene B. Jacobs, Robert J. Hall, Oliver, Stoever & Laskin, Thomas W. Stoever and C. Edward Dilkes for Plaintiff and Appellant.

John H. Larson, County Counsel, Terry C. Smith, Assistant County Counsel, S. Robert Ambrose, Deputy County Counsel, Martin & Flandrick, Robert Flandrick, Harry S. Fenton, Joseph A. Montoya, Robert L. Meyer and Robert W. Vidor as Amici Curiae on behalf of Plaintiff and Appellant.

Fadem, Berger & Stocker, Fadem, Kanner, Berger & Stocker, Fadem, Berger & McIntire and Gideon Kanner for Defendant and Appellant.

## Opinion

**SULLIVAN, J.**—In this action in eminent domain both parties have appealed from a judgment which, inter alia, awarded compensation to the condemnee, a pharmacist, for the value of certain "ethical drugs" located on the condemned real property but refused to award any compensation for loss of business goodwill resulting from the taking. In dealing with the questions thus presented we are required to address a

broad question of constitutional law which, to borrow the image used by one learned commentator in a similar context, has proved remarkably "resistant to analytical efforts."[1] (See Sax, *Takings, Private Property and Public Rights* (1971) 81 Yale L.J. 149, 149.) Simply stated, the question is this: When and to what extent do the state and federal Constitutions require that the "just compensation" to be paid upon the taking or damaging of private property for public use[2] include payment over and above the fair market value of the property taken on account of business losses sustained by the condemnee as a result of the taking?

Sixty years ago we answered this question in decisive fashion, and thereby stated the rule which presently applies in this state and, generally speaking, in all other jurisdictions of this nation.[3] "[T]he real contention of appellant . . . [is] that business is property, and when the taking by the state or its agencies interferes with, impairs, damages, or destroys a business, compensation may be recovered therefor. We are not to be understood as saying that this should not be the law when we do say that it is not our law. It is quite within the power of the legislature to declare that a damage to that form of property known as business or the goodwill of a business shall be compensated for, but unless the constitution or the

[1] The commentators have given eloquent testimony to the durability of the problem. (See, e.g., Bigham, *"Fair Market Value," "Just Compensation," and The Constitution: A Critical View* (1970) 24 Vand.L.Rev. 63; Kanner, *When Is "Property" Not "Property Itself": A Critical Examination of the Bases of Denial of Compensation for Loss of Goodwill in Eminent Domain* (1969) 6 Cal. Western L. Rev. 57; Note, *The Unsoundness of California's Noncompensability Rule As Applied to Business Losses in Condemnation Cases* (1969) 20 Hastings L.J. 675; Aloi & Goldberg, *A Reexamination of Value, Good Will and Business Losses in Eminent Domain* (1968) 53 Cornell L.Rev. 604; Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law* (1967) 80 Harv.L.Rev. 1165; *An Act to Provide Compensation for Loss of Goodwill Resulting From Eminent Domain Proceedings* (1966) 3 Harv.J.Legis. 445; Dunham, *Griggs v. Allegheny County in Perspective: Thirty Years of Supreme Court Expropriation Law* (1962) 1962 Sup.Ct.Rev. 63; Spies & McCoid, *Recovery of Consequential Damages in Eminent Domain* (1962) 48 Va.L.Rev. 437; Note, *Eminent Domain Valuations in An Age of Redevelopment: Incidental Losses* (1957) 67 Yale L.J. 61; Cormack, *Legal Concepts in Cases of Eminent Domain* (1931) 41 Yale L.J. 221.)

[2] The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, (*Chicago, Burlington, etc. R'd v. Chicago* (1897) 166 U.S. 226, 233-241 [41 L.Ed. 979, 983-986, 17 S.Ct. 581]), provides in relevant part: ". . . nor shall private property be taken for public use, without just compensation."

Article I, section 19 (replacing former art. I, § 14) of the California Constitution provides in relevant part: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

[3] See generally 4 Nichols, Eminent Domain (3d ed. 1974) section 13.3, pages 13-148.2-13.165; 1 Orgel, Valuation Under The Law of Eminent Domain (2d ed. 1953) sections 1, 66-77, pages 1-11, 303-334.

legislature has so declared, it is the universal rule of construction that an injury or an inconvenience to a business is *damnum absque injuria,* and does not form an element of the compensating damages to be awarded." (*Oakland* v. *Pacific Coast Lumber etc. Co.* (1915) 171 Cal. 392, 398 [153 P. 705].)

It now appears that while this matter was pending on appeal the Legislature acted in this respect. New section 1263.510 of the Code of Civil Procedure—signed into law by the Governor on October 1, 1975, as a part of a comprehensive revision of the eminent domain law of this state—will operate to render goodwill compensable to a certain extent in cases arising on or after January 1, 1976 (see new § 1230.065). This legislation, however, as all parties hereto readily concede, can have no application to the present proceeding, which was commenced in 1971—nor shall what we have to say below be construed to reflect any views on the part of this court relative to the validity or interpretation of the legislation itself. In the posture of the instant case, the question remains one of constitutional dimension: Must the settled rules of constitutional interpretation in this area now give way, in light of the changing conditions of urban society, to rules of similar constitutional stature providing for compensation for lost business goodwill and other incidental damages consequent upon exercise of the power of eminent domain?

I

The facts of the case before us are these: In the course of implementing its Watts Redevelopment Project, the Community Redevelopment Agency of Los Angeles (Agency) brought this action in eminent domain to acquire real property owned by defendant Arthur J. Abrams. For 27 years preceding the trial Abrams, a pharmacist, had operated his pharmacy on the subject property. His parcel lay within an area of approximately 20 square blocks condemned for the project, and the total condemnation not only took the pharmacy property but eliminated the neighborhood from which Abrams' clientele came.

In his answer to the complaint he claimed as elements of the just compensation required by constitutional provisions (see fn. 2, *ante*) not only the value of the real property but also (1) the value of his inventory of so-called "ethical drugs"—or drugs which may be sold only on prescription—which were in opened containers, and (2) the value of his business goodwill. In support of the latter element Abrams alleged that

by reason of his age (64) and a rheumatoid arthritis condition from which he suffered he was incapable of relocating his business in a new area and thereby retaining or maintaining his business goodwill, and that as a result of this circumstance and the further fact that under state law his inventory of "ethical drugs," insofar as it was in containers already opened, could not be sold to another pharmacist without a certification of purity—the cost of which would exceed the value of the subject drugs—his inventory of "ethical drugs" in opened containers would be rendered valueless by the taking of his real property.

The trial court found on the basis of substantial evidence that by reason of his age and physical condition Abrams was incapable of relocating his business in a new area; that the business goodwill of Abrams' pharmacy had been taken, damaged, and destroyed by the taking of his real property; and that the market for Abrams' stock of "ethical drugs" had been likewise destroyed. As here relevant it concluded as a matter of law that Abrams was entitled to compensation pursuant to article I, section 14, of the state Constitution for his stock of "ethical drugs" in open containers, but that he was not entitled to be compensated for business goodwill. On the basis of these findings and conclusions the trial court awarded Abrams $10,000, the stipulated value of the drugs in open containers, in addition to the value which the jury placed on the real property and fixtures; no award was made for loss of business goodwill. These appeals followed.

## II

Defendant Abrams' arguments on the subject of compensation for business goodwill proceed on two distinct levels. The first is a general attack on the rule of noncompensability, based upon its asserted irrational and arbitrary character. The second is more specific, based upon the particular facts of this case: It urges that whatever be the general rule as to the compensability of business goodwill, compensation should be made when the condemnee is incapable of relocating his business and thus transferring *any part* of his goodwill. We first address ourselves to the more general challenge.

It is urged that the rule of noncompensability for business goodwill is irrational because goodwill is itself "property" in this state and as such should be subject to compensation like any other "property." It is

pointed out that goodwill is declared by statute to be property;[4] that it is treated as such in matters of private law in the areas of tort (see *Carrey* v. *Boyes Hot Springs Resort, Inc.* (1966) 245 Cal.App.2d 618, 622-623 [54 Cal.Rptr. 199]), contract (see *Lyon* v. *Lyon* (1966) 246 Cal.App.2d 519 [54 Cal.Rptr. 829]), business affairs (see *Smith* v. *Bull* (1958) 50 Cal.2d 294 [325 P.2d 463]), marital dissolution (see *In Re Marriage of Foster* (1974) 42 Cal.App.3d 577 [117 Cal.Rptr. 49]), and probate (see *Rankin* v. *Newman* (1896) 114 Cal. 635 [46 P. 742]); and that it is taxable as such (Cal. Const., art. XIII, §§ 1, 2; *Miller & Lux Inc.* v. *Richardson* (1920) 182 Cal. 115, 127-128 [187 P. 411]; *Bank of California* v. *San Francisco* (1904) 142 Cal. 276, 288-289, cf. dis. opn., pp. 291-292 [75 P. 832]). The only area in which business goodwill is denied the status of property, defendant asserts, is when the government "takes and destroys" it for public use. The result, it is urged, is not only a violation of constitutional "just compensation" clauses (see fn. 2, *ante*) but a denial of equal protection of the laws.

The foregoing contentions betray a fundamental misunderstanding. The courts of this state have never taken the position that business goodwill is not property—indeed, such a position would be wholly inconsistent with statutory provisions to the contrary (see fn. 4, *ante*). What the courts have established is that "that form of property known as business or the goodwill of a business" (*Oakland* v. *Pacific Coast Lumber etc. Co., supra*, 171 Cal. 392, 398) is not the form of property to which constitutional provisions requiring just compensation refer. As the leading commentator has stated the essentially universal rule, "An established business, or what is called 'good will,' has never been held to be by itself property *in the constitutional sense.*[1] . . . [¶] While it may be an added element of value to a particular piece of land taken, a business is less tangible in nature and more uncertain in its vicissitudes than the rights which the constitution undertakes to protect absolutely. Although in some cases the destruction of an established business works a much greater hardship than many injuries for which the constitution makes

---

[4]Section 654 of the Civil Code provides: "The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others. In this Code, the thing of which there may be ownership is called property."

Section 655 of the Civil Code provides: "There may be ownership of all inanimate things which are capable of appropriation or of manual delivery; of all domestic animals; of all obligations; of such products of labor or skill as the composition of an author, *the good-will of a business,* trade marks and signs, and of rights created or granted by statute." (Italics added.)

Section 14102 of the Business and Professions Code provides: "*The good will of a business is property* and is transferable." (Italics added.)

[1]"Good will is generally held property in matters of private law. . . ."

compensation necessary, diminution of its value is considered a vaguer injury than the type of taking or appropriation with which the constitution deals. A business might be destroyed by the construction of a more popular street into which travel was diverted or by a change in the location of a railroad station, a subway entrance, or even a transfer point for street care [*sic*] (as well as by competition), but there would be as little claim in the one case as in the other. [¶] The case is no different when the business is destroyed by taking the land on which it was conducted." (4 Nichols, Eminent Domain, *supra*, § 13.3, pp. 13-148.2-13-149.3; fns. 2 and 3 omitted; italics added.)[5]

It is clear from the foregoing that defendant's linguistic arguments based upon the status of goodwill as property simply ignore established precedents and, in so doing, beg the real question we face today. The fact that business goodwill is legislatively declared to be property and is treated as such in various legal contexts, does not render per se *irrational* a rule which refuses to treat it as such in a constitutional sense for purposes of awarding compensation in eminent domain. The inquiry must go much deeper—into an examination of the reasons for this distinction. Only when that examination has been made can it be determined whether the considerations of constitutional policy underlying it are presently valid.

Before turning to the indicated task we address ourselves to another contention of defendant which appears to us to be equally superficial. It is contended that the general rule denying compensation for loss of business goodwill is arbitrary because it is "shot through" with exceptions. The first such exception to which defendant refers is that relating to the condemnation of public utilities. (See *Southern Calif. Edison Co.* v. *Railroad Com.* (1936) 6 Cal.2d 737, 750-751 [59 P.2d 808].) However, it must be noted that compensation awarded by the Public Utilities Commission for goodwill or going-concern value of public utilities is based upon wholly separate constitutional and statutory provisions.[6] The

---

[5]Compare 1 Orgel, Valuation Under The Law of Eminent Domain, *supra*, section 1, page 5: "It goes without saying that the courts have never construed the 'just compensation' clause of a federal or state constitution as requiring payment for all injuries imposed upon persons or property by acts of government. Any such requirement would make government itself impossible."

[6]Article XII, section 5, of the California Constitution provides: "The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission, to establish the manner and scope of review of commission action in a court of record, and

*Southern California Edison* case itself points this out at the pages above cited. Surely a rule of compensation based upon constitutional and statutory provisions other than those we now consider can hardly be deemed an "exception" to the rule applicable under the provisions before us. Moreover, we find no merit in the claim that the allowance of compensation for going-concern value in public utilities cases, viewed alongside the denial of such compensation in cases not involving public utilities, results in a denial of equal protection of the laws. The rational basis for this distinction is clear: "In the first place, the utility plant is uniquely adapted to the enterprise and cannot be separately sold. In the second place, the plant is so intimately connected with the remainder of the enterprise that the taking of the one necessarily means the destruction of the other. In the third place, while in the ordinary real estate condemnation, the taker acquires the property intending to convert it to a different use, in the condemnation of a public utility the taker not only destroys the company's chances of re-establishing the business but itself receives the benefit of customer connections, personnel and other intangible aspects of the enterprise." (2 Orgel, Valuation Under The Law of Eminent Domain, *supra,* pp. 58-59.)

Defendant's search for "exceptions" to the general rule denying compensation for loss of business goodwill next leads him to make reference to various instances in which evidence of lost business profits is

---

to enable it to fix *just compensation for utility property* taken by eminent domain." (Italics added.)

Section 1411 of the Public Utilities Code provides in relevant part: "When the proceeding has been submitted, the commission shall make and file its written finding fixing, in a single sum, the just compensation to be paid by the political subdivision for the lands, property, *and rights.*" (Italics added.)

The fact that the law provides two distinct methods for governmental acquisition of public utilities—proceedings before the commission pursuant to section 1401 et seq. of the Public Utilities Code, and judicial eminent domain proceedings pursuant to section 1237 et seq. of the Code of Civil Procedure (see *Citizens Utilities Co.* v. *Superior Court* (1963) 59 Cal.2d 805, 814-815 [31 Cal.Rptr. 316, 382 P.2d 356]; *City of North Sacramento* v. *Citizens Utilities Co.* (1963) 218 Cal.App.2d 178, 181 [32 Cal.Rptr. 308])—does not, as defendant suggests, "create serious equal protection problems" due to differing substantive measures of recovery according to the method chosen. As we said in *Citizens Utilities Co.* v. *Superior Court, supra,* it was the clear intent of the Legislature to create alternative methods of *procedure,* and that procedure authorized by the Public Utilities Code should not be held to be exclusive of the judicial method "at least so long as no constitutional or other rights are violated by the procedure under the Code of Civil Procedure." (59 Cal.2d at p. 815; see also *Marin M. W. Dist.* v. *Marin W. etc. Co.* (1918) 178 Cal. 308, 316 [173 P. 469].) It is manifest that the measure of compensation vouchsafed a public utility by the Public Utilities Code—i.e. "just compensation . . . for [its] lands, property, *and rights*"—is also to be accorded it in proceedings under the Code of Civil Procedure. (See *Citizens Utilities Co.* v. *Superior Court, supra,* 59 Cal.2d at p. 817.)

taken into account in making an award for government taking or damage. He points out that such evidence may be considered in certain cases of inverse condemnation in arriving at the difference between the value of the real property before and after the injury (see *Natural Soda Prod. Co.* v. *City of L. A.* (1943) 23 Cal.2d 193, 199-201 [143 P.2d 12]; *Inyo Chemical Co.* v. *City of Los Angeles* (1936) 5 Cal.2d 525, 542-543 [55 P.2d 850]; *Frustuck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345, 367 [28 Cal.Rptr. 357]); that it may likewise be regarded in cases of severance damage in order to determine whether and how the value of the remainder for its immediate highest and best use has been affected (see *Ventura County Flood Control Dist.* v. *Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1002-1003 [93 Cal.Rptr. 653], and cases there cited; *People* ex rel. *Dept. Public Works* v. *Giumarra Vineyards Corp.* (1966) 245 Cal.App.2d 309, 319-320 [53 Cal.Rptr. 902]); that it may also be considered in cases involving a temporary taking (see *Kimball Laundry Co.* v. *U. S.* (1949) 338 U.S. 1, 8-21 [93 L.Ed. 1765, 1773-1780, 69 S.Ct. 1434, 7 A.L.R.2d 1280]); and, finally, that it is taken into account in determining the capitalized value of a leasehold interest in condemned realty (see Evid. Code, §§ 817, 819). We are again at a loss, however, to understand how these rules may be considered "exceptions" to the rule here challenged. In each case to which defendant has reference the courts have been careful to explain that considerations entirely different from those underlying the rule of noncompensability for business goodwill require the application of an entirely different rule.

The case of *Kimball Laundry Co.* v. *U. S., supra,* 338 U.S. 1, provides an instructive example. There the federal government during the Second World War had acquired the petitioner's laundry plant, which it continued to operate as a laundry for the army, retaining most of the petitioner's employees. The taking was not permanent but was subject to renewal at the election of the Secretary of War, and the property was returned to the petitioner at the conclusion of the war. Agreeing with the trial court that the proper measure of compensation was the rental that probably would have been obtained in free bargaining between the petitioner and a hypothetical lessee of the temporary interest, and that damage to machinery in excess of ordinary wear and tear should also be compensated, the United States Supreme Court went on to consider the petitioner's claim for incidental damages for the destruction of its "trade routes"—which term "serves as a general designation both for the lists of customers built up by solicitation over the years and for the continued hold of the Laundry upon their patronage." (338 U.S. at p. 8 [93 L.Ed. at p. 1773].) The trial court had denied compensation in this respect,

holding that such damage did not bear upon the " 'fair market value or fair use value of the property taken' " (*id.*) but the high court reversed. Holding that the value alleged to inhere in the petitioner's trade routes was essentially the going-concern value of its business, and that the intangible nature of this value did not in and of itself preclude compensation for it,[7] the court went on in several illuminating passages to explain the circumstances under which compensation for such a value would be required by the Constitution.

"What, then, are the circumstances under which the Fifth Amendment requires compensation for such an intangible? Not, indeed, those of the usual taking of fee title to business property, but the denial of compensation in such circumstances rests on a very concrete justification: the going-concern value has not been taken. Such are all the cases, most of them decided by State courts under constitutions with provisions comparable to the Fifth Amendment, in which only the physical property has been condemned, leaving the owner free to move his business to a new location. [Citations.] In such a situation there is no more reason for a taker to pay for the business' going-concern value than there would be for a purchaser to pay for it who had not secured from his vendor a covenant to refrain from entering into competition with him. It is true that there may be loss to the owner because of the difficulty of finding other premises suitably situated for the transfer of his good will, and that such loss, like the cost of moving, is denied compensation as consequential. [Citation.] But such value as the good will retains, the owner keeps, and the remainder dissipated by removal would not contribute to the value paid for by a transferee of the vacated premises, except perhaps to the extent that the prospect of its loss would induce the

---

[7]"The value of all property, as we have already observed, is dependent upon and inseparable from individual needs and attitudes, and these, obviously, are intangible. As fixed by the market, value is no more than a summary expression of forecasts that the needs and attitudes which made up demand in the past will have their counterparts in the future. [Citations.] The only distinction to be made, therefore, between the attitudes which generate going-concern value and those of which tangible property is compounded is as to the tenacity of the past's hold upon the future: in the case of the latter a forecast of future demand can usually be made with greater certainty, for it is more probable on the whole that people will continue to want particular goods or services than that they will continue to look to a particular supplier of them. It is more likely, in other words, that people will persist in wanting to have their laundry done than that they will keep on sending it to a particular laundry. But as the probability of continued patronage gains strength, this distinction becomes obliterated, and the intangible acquires a value to a potential purchaser no different from the value of the business' physical property. Since the Fifth Amendment requires compensation for the latter, the former, *if shown to be present and to have been 'taken,'* should also be compensable." (*Kimball Laundry Co.* v. *U. S., supra,* 338 U.S. 1, 10-11 [93 L.Ed. 1774-1775]; italics added.)

owner to hold out for a higher price for his land and building. Cf. *United States* v. *General Motors Corp.,* 323 U.S. 373, 383. When a condemnor has taken fee title to business property, there is reason for saying that the compensation due should not vary with the owner's good fortune or lack of it in finding premises suitable for the transference of going-concern value. In the usual case most of it can be transferred; in the remainder the amount of loss is so speculative that proof of it may justifiably be excluded. See *Sawyer* v. *Commonwealth,* 182 Mass. 245 . . ., per Holmes, C. J. By an extension of that reasoning the same result has been reached even upon the assumption that no other premises whatever were available. *Mitchell* v. *United States,* 267 U.S. 341." (338 U.S. at pp. 11-12 [93 L.Ed. at p. 1775].)

At this point the *Kimball* court went on to contrast the foregoing situation with that in which the *inevitable effect* of a taking is to deprive the owner of the going-concern value of his business—giving as an example the area of public utility condemnation. "If such a deprivation has occurred," the court concluded, "the going-concern value of the business is at the Government's disposal whether or not it chooses to avail itself of it," and compensation should be awarded accordingly. (338 U.S. at p. 13 [93 L.Ed. at p. 1776].)

Finally, applying this latter principle to the case before it, the *Kimball* court made a series of observations pertinent to the issue before us at this time. The temporary taking of the petitioner's premises, the court held, completely appropriated its opportunity to profit from its trade routes— just as completely as a promise not to compete would have done. While the government remained in possession, the petitioner's investment remained bound up in the reversion. While the trade routes remained technically capable of transfer independently of the physical property with which they had been associated, it was "wholly beyond the realm of conjecture" that they could have been temporarily transferred subject to recapture. "It is arguable, to be sure," the court went on, "that since an equally suitable plant might conceivably have been available to the petitioner at reasonable terms for the same period as the Government's occupancy of its own plant, and since that would have enabled it to stay in business without loss of going-concern value, it is irrelevant that no such premises happened to be available, as it would have been irrelevant, under a strict application of *Mitchell* v. *United States [supra]* had the Government taken the fee. When fee title to business property has been taken, however, it is fair on the whole that the amount of compensation payable should not include speculative losses consequent

upon realization of the remote possibility that the owner will be unable to find a wholly suitable location for the transfer of going-concern value. But when the Government has taken the temporary use of such property, it would be unfair to deny compensation for a demonstrable loss of going-concern value upon the assumption that an even more remote possibility—the temporary transfer of going-concern value—might have been realized. The temporary interruption as opposed to the final severance of occupancy so greatly narrows the range of alternatives open to the condemnee that it substantially increases the condemnor's obligation to him. It is a difference in degree wide enough to require a difference in result." (338 U.S. at pp. 14-15 [93 L.Ed. at p. 1777].)

■ We learn from the foregoing that the rule denying compensation for business goodwill, far from being "shot through" with exceptions, is uniformly applied in all cases to which it is applicable—i.e., in all cases wherein the condemnor takes the fee upon which a business is conducted and does not *by the nature of its action* wholly preclude the condemnee from transferring its going-concern or goodwill value to another location. We also learn that this rule is based on the conviction that it is "fair on the whole" to treat all such condemnees alike, refusing to create distinctions on the basis of "the remote possibility that the owner will be unable to find a wholly suitable location for the transfer of going-concern value." (*Kimball, supra,* at p. 15 [93 L.Ed. at p. 1777].) We are thus brought to the question which lies at the core of our inquiry: Does the erosion by modern conditions of the assumptions underlying this rule require its abrogation as a matter of constitutional law and its replacement with a constitutionally grounded and judicially administered rule of compensation more responsive to present-day realities?[8] It is to this question that we now turn our attention.

### III

We judicially notice the following as facts "of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute" (Evid. Code, § 451, subd. (f)): The conditions of modern American life, including the increased concentration of people in urban centers and the need for increased governmental activity in the areas of transportation and urban redevelopment, have resulted in the disruption and displacement of increased numbers of people and businesses by

---

[8]We re-emphasize at this point that we here consider defendant's general attack on the rule of noncompensability for business goodwill, not his more specific contention based on the particular facts of this case. The latter contention will be taken up in due course.

government projects. Moreover, the peculiar nature of urban redevelopment programs, which act upon large areas of contiguous property, often involves the uprooting of entire neighborhoods and the consequent dispersal of their business and residential occupants to other areas. (See generally *An Act to Provide Compensation For Loss of Goodwill Resulting From Eminent Domain Proceedings, supra,* 3 Harv.J.Legis. 445, 447-448 (memo.); Note, *Eminent Domain Valuation in an Age of Redevelopment: Incidental Losses, supra,* 67 Yale L.J. 61.)

While the effects of this process are severe in both a personal and social sense for the residential occupants of areas subjected to redevelopment, its effects upon business occupants may be even more serious. One such effect relates to the business goodwill which such a businessman has built up in the location of which he is deprived by condemnation. In some cases, as for example in the case of a mail order business whose clientele is not rooted in the area affected by redevelopment, business goodwill may be transferred with relative ease to a new location outside the redevelopment area. At the other end of the spectrum, however, are businesses which depend on a clientele within the redevelopment area. In many such cases business goodwill is based almost wholly upon the businessman's personal acquaintance with his customers and his knowledge of their particular needs. Such goodwill is by its nature not freely transferable within the context of wholesale condemnation pursuant to urban redevelopment, for the inevitable effect of such condemnation is to disperse the businessman's clientele throughout the urban area, with the result that any new location chosen by him will be unable to continue to profitably serve a significant portion of them.

It is clear that to apply the rule of noncompensability for loss of business goodwill to cases in which the assumption underlying it—i.e., that such goodwill is not "taken" or "damaged" but remains subject to transfer to a new location—does not hold true is in effect to require the affected parties to bear a disproportionate share of the true cost of the public undertaking. It is the increased incidence of this occurrence, brought about by the modern urban conditions adverted to above, which has .been the basis of scholarly comment critical of the rule. (See generally, materials cited at fn. 1, *ante.*) ■ The question before us is whether these considerations require that we hold *as a matter of constitutional law* that business goodwill is now to be considered a compensable element of damage in eminent domain.

As we have repeatedly emphasized, it is the underscored language which is the kernel of the controversy before us. To recognize that there

are substantial numbers of cases in which the assumption underlying the rule of noncompensability for business goodwill is not borne out by the particular facts is not necessarily to conclude that alteration of the *constitutional* rule is required. It is at this point that a consideration of institutional functions and capacities must come into play.

It is strenuously urged that because ultimate responsibility for determining the amount of compensation to be paid for property taken under constitutional "just compensation" clauses lies with the courts (see *United States* v. *New River Collieries* (1923) 262 U.S. 341, 343-344 [67 L.Ed. 1014, 1017, 43 S.Ct. 565]; *Seaboard Air Line Ry.* v. *United States* (1923) 261 U.S. 299, 304 [67 L.Ed. 664, 669, 43 S.Ct. 354]; *Monongahela Navig'n Co.* v. *United States* (1893) 148 U.S. 312, 327 [37 L.Ed. 463, 468, 13 S.Ct. 622]; *County of Los Angeles* v. *Ortiz* (1971) 6 Cal.3d 141, 145 [98 Cal.Rptr. 454, 490 P.2d 1142]), it is the courts who must fashion rules insuring that losses of business goodwill occasioned through condemnation be compensated.

This argument, at least insofar as it implies that the sole institution which may provide standards of compensation is the courts, proceeds upon an invalid premise, to wit, that the "just compensation" prescribed by constitutional provisions contemplates total indemnification for damage sustained through condemnation. However, as we have pointed out above (see text accompanying fn. 5, *ante*), the law simply does not equate "just compensation" with total indemnification.[9] We have not far to look in California jurisprudence for cases other than those involving business goodwill in which *demonstrable loss* resulting from condemnation has been held not to constitute an element of *constitutionally required* "just compensation." For example, in *County of Los Angeles* v. *Ortiz, supra,* 6 Cal.3d 141, we held that a condemnee's litigation expenses, although clearly resulting in a loss to the condemnee which he would not have sustained absent condemnation, did not, under a virtually unbroken line of authority, form an element of damage required to be paid by the Constitution. Such costs, we concluded, were "of policy as distinguished from constitutional dimension" and the allowance of their recovery rested with the Legislature rather than the

---

[9]We are of course aware of language in some cases which indicates that "The owner is to be put in as good a position pecuniarily as he would have occupied if his property had not been taken from him." (*People* ex rel. *Dept. Pub. Wks.* v. *Lynbar, Inc.* (1967) 253 Cal.App.2d 870, 880 [62 Cal.Rptr. 320]; see also *United States* v. *Miller* (1943) 317 U.S. 369, 373 [87 L.Ed. 336, 342, 63 S.Ct. 276, 147 A.L.R. 55].) This language, which we have previously characterized as "panoramic" (*County of Los Angeles* v. *Ortiz, supra,* 6 Cal.3d 141, 147), makes up in idealism what it lacks in universal application.

courts. (6 Cal.3d at pp. 148-149.)[10] Similarly, in *Town of Los Gatos* v. *Sund* (1965) 234 Cal.App.2d 24 [44 Cal.Rptr. 181], it was held that expenses of moving personal property involved in the business conducted on the condemned property, although clearly incurred by the condemnee as a result of the condemnation, were not compensable under constitutional "just compensation" provisions, and that any appeal for their allowance must be made to the Legislature.[11] What these cases show is simply that compensation provided for the taking of real property through eminent domain may be "just" within the meaning of the constitutional provisions without providing complete reimbursement to the owner for all losses suffered by him as a result of condemnation, and that in at least some cases in which the constitutional measure of compensation falls demonstrably short of that required to make the condemnee "whole," his recourse must be to the Legislature.

The central issue, then, is whether compensation for loss of business goodwill should be included within the constitutional minimum required by "just compensation" clauses or whether it should continue to be excluded from that measure and remain subject to legislative competence for the redress of demonstrable losses. We have concluded that valid reasons of policy, based primarily upon considerations of institutional competence, counsel in favor of judicial deference to the legislative branch in fashioning standards and procedures responsive to present realities in this area.

Loss of business goodwill due to condemnation of business premises is just one of a number of areas in which demonstrable loss and inconvenience are suffered by those who are uprooted from their homes and businesses by the modern phenomenon of urban redevelopment programs. The damage sustained ranges from the relatively imponderable (for example, educational damage caused young persons by midstream changes in schools) to the relatively tangible (for example,

---

[10]Partial legislative response in this area has come in the form of new section 1249.3 of the Code of Civil Procedure (enacted in 1974), which requires the parties to make final settlement offers prior to trial and awards the defendant his litigation expenses when it appears after trial that the plaintiff's offer was unreasonably low. Litigation expenses, including reasonable attorney's fees, appraisal fees, and fees for the services of experts, are also awarded by statute when the eminent domain proceeding is ultimately abandoned (Code Civ. Proc., § 1255a) or the defendant secures a judgment that the condemnor may not acquire the real property (Code Civ. Proc., § 1246.4). Further provisions in this area are included in the 1975 act (new Code Civ. Proc., § 1268.610).

[11]Legislative response in this area appeared in 1971 amendments to the state Relocation Assistance Act, specifically with the addition of subdivision (a) (2) to section 7262 of the Government Code. We discuss this act in some detail below.

expenses incurred by a family or a business in moving personal property from condemned realty to a new location). In the specific area with which we are here concerned—to wit, loss of business goodwill—there are similar problems. Thus, even assuming as defendant insists that the goodwill possessed by a business at one location is capable of accurate translation into a dollar amount, to what extent must the assumption of transferability (upon which, as we have seen, the rule of noncompensability rests) break down in the particular case to justify compensation, and what amount of compensation is appropriate when the breakdown of the assumption is less than total?

The courts, although rarely making explicit reference to the overall problem, have, by their case by case rulings in accordance with established principles such as that we consider today, demonstrated a fundamental awareness of the real dimensions of the underlying problem. In the words of one perceptive commentator, "the courts recognize that they cannot, through the enunciation of doctrine which decides cases, adequately stake out the limits of fair treatment; that if the quest for fairness is left to a series of occasional encounters between courts and public administrators it can but partially be fulfilled; and that the political branches, accordingly, labor under their own obligations to avoid unfairness regardless of what the courts may require." (Michelman, *Property, Utility, and Fairness: Comments on The Ethical Foundations of "Just Compensation" Law, supra,* 80 Harv.L.Rev. 1165, 1252.)[12]

---

[12]The cited article by Professor Michelman, which must be acknowledged a landmark in the field of compensation analysis, goes far to explicate the nature of the broad problem of compensation for public takings and the role of courts, legislatures, and other public bodies in providing solutions for that problem. Professor Michelman's thesis is stated in brief in the following paragraph from his article: "A serious objection to the habit of leaving fairness discipline to the courts is that we may thereby miss opportunities to make good use of settlement methods too artificial or innovative for judicial adoption. A court, it seems, must choose between denying all compensation and awarding 'just' compensation; the loss is either a 'taking' of 'property' or it is not. If 'just' compensation is essentially incalculable, or if the cost of computing it is very high, the court may be led to classify a situation as non-compensable. If choice must be relegated to this framework, we shall not be able to exploit the substitutability of settlement costs and demoralization costs. [*] It may be that even though that settlement which would reduce demoralization costs to zero would be prohibitively costly, there exists some relatively cheap form of settlement which would reduce demoralization costs so effectively that, by using it, we can reduce the total of settlement plus demoralization costs below what they would be in the absence of any settlement. Such a settlement technique, if one exists, is very likely to require legislative adoption." (Michelman, *supra,* 80 Harv.L.Rev. at pp. 1253-1254; fns. omitted.)

---

*" 'Demoralization costs' are defined as the total of (1) the dollar value necessary to offset disutilities which accrue to losers and their sympathizers specifically from the realization that no compensation is offered, and (2) the present capitalized dollar value

It is manifest that state and federal legislative bodies have begun to demonstrate their awareness of such obligations. The federal Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 U.S.C. § 4601 et seq.) and the interlocking[13] California Relocation Assistance Act (Gov. Code, § 7260 et seq.) have made substantial strides in the direction of providing—in the words of the declaration of policy of the federal act—"fair and equitable treatment of persons displaced as a result of [public] programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole." (42 U.S.C. § 4621.) Thus, provision is now made for the payment of moving and related expenses (42 U.S.C. § 4622; Gov. Code, § 7262), acquisition of replacement housing (42 U.S.C. §§ 4623, 4624, 4626; Gov. Code, §§ 7263, 7263.5, 7264, 7264.5), and advisory services (42 U.S.C. § 4625; Gov. Code, § 7261). As to the matter of business relocation, the acts provide for in lieu payment (based upon average net earnings) of up to $10,000 in cases wherein the business cannot be relocated without substantial loss of patronage and is not a part of an enterprise having another establishment or establishments in the same or similar business which are not being acquired. (42 U.S.C. § 4622 (c); Gov. Code, § 7262, subd. (c).)[14] (See generally 6A Nichols, Eminent Domain, *supra,* ch. 34; Comment: *Relocation Assistance in California: Legislative Response to the Federal Program* (1972) 3 Pacific L.J. 114.)

---

of lost future production (reflecting either impaired incentives or social unrest) caused by demoralization of uncompensated losers, their sympathizers, and other observers disturbed by the thought that they themselves may be subjected to similar treatment on some other occasion. 'Settlement costs' are measured by the dollar value of the time, effort, and resources which would be required in order to reach compensation settlements adequate to avoid demoralization costs. Included are the costs of settling not only the particular compensation claims presented, but also those of all persons so affected by the measure in question or similar measures as to have claims not obviously distinguishable by the available settlement apparatus." (Michelman, *supra,* 80 Harv.L. Rev. at p. 1214; fns. omitted.)

[13]The federal act provides in substance that federal assistance for public projects is contingent upon the state providing payments as outlined in the federal act, and that the payments so made shall be included in the cost of the program for which federal assistance is available. (See 42 U.S.C. §§ 4630, 4631.)

[14]The federal act provides: "(c) Any displaced person eligible for payments under subsection (a) of this section who is displaced from his place of business or from his farm operation and who elects to accept the payment authorized by this subsection in lieu of the payment authorized by subsection (a) of this section, may receive a fixed payment in an amount equal to the average annual net earnings of the business or farm operation, except that such payment shall be not less than $2,500 nor more than $10,000. In the case of a business no payment shall be made under this subsection unless the head of the Federal agency is satisfied that the business (1) cannot be relocated without a substantial loss of its existing patronage, and (2) is not a part of a commercial enterprise having at

The foregoing acts do not address themselves directly to the matter here before us, i.e., loss of business goodwill. However it is clear that the provision for in lieu payments adverted to above represent an attempt to provide some compensation (up to the maximum of $10,000) for business losses occasioned through condemnation.[15] More importantly, the recent action of the Legislature in enacting new section 1263.510 of the Code of Civil Procedure—which section will in future cases provide compensation for loss of goodwill in coordination with applicable provisions of the Relocation Assistance Act[16]—manifests an explicit legislative recognition of the problem and a willingness to address itself to it.[17]

In view of all of the foregoing we have concluded that sound reasons of constitutional and judicial policy counsel against a present reinterpretation of constitutional "just compensation" clauses to require compen-

least one other establishment not being acquired by the United States, which is engaged in the same or similar business. For purposes of this subsection, the term 'average annual net earnings' means one-half of any net earnings of the business or farm operation, before Federal, State, and local income taxes, during the two taxable years immediately preceding the taxable year in which such business or farm operation moves from the real property acquired for such project, or during such other period as the head of such agency determines to be more equitable for establishing such earnings, and includes any compensation paid by the business or farm operation to the owner, his spouse, or his dependents during such period."
The relevant provisions of the state act (Gov. Code, § 7262, subd. (c)) are similar in all pertinent respects.

[15]This, like the other provisions of the respective relocation acts, is clearly an effort by the legislative arm of government to introduce what Professor Michelman would term a "relatively cheap form of settlement [designed to] reduce demoralization costs so effectively that, by using it, we can reduce the total of settlement plus demoralization costs below what they would be in the absence of any settlement." (See fn. 12, *ante.*)

[16]New section 1263.510, effective January 1, 1976, provides:
"(a) The owner of a business conducted on the property taken, or on the remainder if such property is part of a larger parcel, shall be compensated for loss of goodwill if the owner proves all of the following:
"(1) The loss is caused by the taking of the property or the injury to the remainder.
"(2) The loss cannot reasonably be prevented by a relocation of the business or by taking steps and adopting procedures that a reasonably prudent person would take and adopt in preserving the goodwill.
"(3) Compensation for the loss will not be included in payments under Section 7262 of the Government Code.
"(4) Compensation for the loss will not be duplicated in the compensation otherwise awarded to the owner.
"(b) Within the meaning of this article, 'goodwill' consists of the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage."

[17]Although, as we have observed at the outset of this opinion, the provisions of new section 1263.510 are not applicable to this proceeding, we believe it appropriate to make reference to them as a manifestation of continued legislative concern in this area.

sation for business goodwill affected or damaged by exercise of the power of eminent domain. The present discrete limits upon constitutionally compelled compensation, while seeming arbitrary and irrational from the point of view of total indemnification for losses sustained through condemnation, suffer from neither of those vices when viewed in the proper context of institutional functions and capabilities. The courts, in essentially limiting the scope of constitutionally compelled compensation to the fair market value of real property taken or damaged by public projects, have in essence recognized their limitations in providing overall fair treatment for persons who suffer injuries as a result of public projects. The legislative branch of government, recognizing its peculiar competence in this area, has undertaken responsive steps and evidences a willingness to continue to deal with the difficult and involved questions of social policy which underlie the task. In these circumstances wisdom lies in the direction of judicial deference to the legislative branch. We therefore reaffirm the longstanding and uniform rule of constitutional interpretation which holds that the provisions of the state and federal Constitutions providing for the payment of just compensation upon the taking or damaging of private property for public use (see fn. 2, *ante*) do not require that compensation be paid for the loss of business goodwill sustained due to the exercise of the power of eminent domain, and that recourse for recoupment of injury of this kind must lie with the legislative branch. We further hold that this rule is based upon sound considerations of governmental policy and does not operate to deny affected parties the equal protection of the laws.

## IV

As we have indicated above, defendant's attack upon the trial court's failure to include the loss of business goodwill is based not only upon his general challenge to the rule of noncompensability, which we have treated above, but also upon the particular facts of this case, as reflected in the trial court's findings. The substance of the applicable findings was (1) that due to his age and physical condition defendant Abrams was wholly incapable of relocating his business in a new area, and (2) that as a result the business goodwill of his pharmacy was taken, damaged, and destroyed by the taking of his real property. It is clear from what we have said above, however, that damage resulting to business goodwill due to the failure or inability of the condemnee, in his particular personal circumstances, to transfer that goodwill to another location, cannot form an element of the compensation required by applicable constitutional provisions. Accordingly, the trial court was correct in denying compensation in this respect.

## V

■ As we have pointed out above (part I, *ante*), the trial court in this case awarded compensation for the stipulated value ($10,000) of certain "ethical drugs" owned by defendant on the ground that condemnation had destroyed his market for these drugs. The drugs in question were in opened containers, and the trial court—apparently reasoning that because defendant Abrams' physical condition rendered relocation of the business impossible, and because state law essentially forbids resale of "ethical drugs" in opened containers to another pharmacist without a certification of purity[18] (the cost of which would exceed the value of the subject drugs)—concluded as a matter of law as follows: "ABRAMS' ethical drugs in open containers, as his personal property, are compensable under Cal. Const. Art. 1, § 14 [now Cal. Const., art. I, § 19—see fn. 2, *ante*] (Sutfin v. State (1968) 261 Cal.App.2d 50 [67 Cal.Rptr. 665])."

Plaintiff challenges this determination on appeal. It urges that the "ethical drugs" in question—i.e., those in opened containers—are movable personal property not affixed to the realty and as such are noncompensable in an eminent domain proceeding brought to acquire a parcel of real property. (See 2 Nichols, Eminent Domain, *supra,* § 5.84, pp. 5-438 - 5-439; *City of Los Angeles* v. *Allen's Grocery Co.* (1968) 265 Cal.App.2d 274, 279 [71 Cal.Rptr. 88].) It submits that the case of *Sutfin* v. *State, supra,* 261 Cal.App.2d 50, cited by the trial court in support of its conclusion, is readily distinguishable because that case—an action in inverse condemnation for damage to automobiles inundated by flood waters resulting from a state highway project—involved actual physical invasion of the plaintiff's personal property and moreover did not concern public acquisition of real property through eminent domain. The universal rule and California rule, plaintiff insists, is that personal property not affixed to the realty cannot form an element of compensation under constitutional provisions assuring "just compensation" when the realty is taken through eminent domain; this rule, it is asserted, applies regardless of whether the subject personal property is rendered essentially valueless by condemnation of the realty.

Defendant offers strenuous arguments to the contrary, urging that *Sutfin* is controlling and that recent decisions in state and federal courts have undermined the reasoning upon which the so-called general rule

---

[18]See California Administrative Code, title 16, section 1717 (a). All pertinent evidence before the court indicated that upon discontinuation of his business defendant Abrams would be unable to dispose of his stock of "ethical drugs" to another pharmacist.

rests—at least in cases wherein condemnation has had the effect of rendering the subject personal property essentially valueless.

We believe that all of defendant's contentions in this respect may be answered by noting a fundamental distinction between this case and the *Kimball Laundry* case to which we have made extensive reference in part III above. In *Kimball Laundry*, it will be recalled, the United States Supreme Court held that when the government by its act of condemnation rendered the condemnee's trade routes essentially valueless to it during the period of the temporary taking there involved, compensation was required because the specific nature of the condemnatory act involved (i.e., a temporary taking) *in and of itself* brought about the total devaluation in question.

In the instant case, on the other hand, the act of condemning the property upon which defendant conducted his business did not *in and of itself* result in the loss of value of which defendant complains. Rather, as we have pointed out above with respect to the matter of business goodwill, it was the personal circumstances of the condemnee himself—specifically his age and physical condition—which operated to prevent his transfer of his "ethical drugs" to a new location and his realization of their value at that new location. (See part IV, *ante.*) It was only this factor which rendered significant the fact of legal limitations upon the sale of those drugs to another pharmacist. Thus, the expansion of the general rule which defendant seeks is not one based on the nature of the condemnatory act but upon its practical effect in particular personal circumstances. No case has been cited to us or has been found as a result of our study which would justify departure in this situation from the universal rule denying compensation for movable, nonaffixed personal property on condemned realty.[19] We conclude that the award of compensation *on a constitutional basis* in this instance was inappropriate and erroneous.

Considerations similar to those expressed by us in part III above also support our conclusion in this matter. The California Relocation Assistance Act, at section 7262 of the Government Code, makes specific provision for the award of statutory compensation in cases of this nature. Subdivision (a) of that section provides: "As a part of the cost of

---

[19]The so-called "constructive annexation" cases, such as *City of Los Angeles* v. *Klinker* (1933) 219 Cal. 198 [25 P.2d 826, 90 A.L.R. 148], and *In Re Slum Clearance, City of Detroit* (1952) 332 Mich. 485 [52 N.W.2d 195], are clearly distinguishable. There is no suggestion in this case that defendant's "ethical drugs" are so adapted for use on the condemned realty that they must be considered a part of it.

acquisition of real property for a public use, a public entity shall compensate a displaced person for his: (1) Actual and reasonable expense in moving himself, family, business, or farm operation, including moving personal property. (2) *Actual direct losses of tangible personal property as a result of moving or discontinuing a business* or farm operation, but *not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the public entity.* (3) Actual and reasonable expenses in searching for a replacement business or farm." (Italics added.)[20]

Clearly the underscored language contemplates that an owner of a business on real property acquired for public use may elect either to move that business to a new location or to discontinue it entirely. When he chooses the latter alternative, as defendant Abrams has done in this case, and "actual direct losses of tangible personal property" result—as they are alleged to have resulted in this case—the statute provides for compensation up to "an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the public entity. Clearly, in the case of discontinuance as opposed to moving, the "reasonable expenses that would have been required to relocate" are those which would be required in order to place the subject property in the hands of one who could utilize it after the owner's discontinuance of business. Here it was alleged, and the trial court apparently concluded, that those expenses would exceed the value of the "ethical drugs" themselves.

The presence of the foregoing statute, in combination with the considerations of policy which we have discussed in part IV above, buttresses our conclusion that the trial court was in error when it held that the settled rule of constitutional interpretation (forbidding compensation for personal property not affixed to the condemned realty) should be relaxed in cases wherein condemnation has the practical result—due to circumstances personal to the owner—of diminishing the value to him of movable personal property located on the condemned premises. The Legislature has brought its special competence to this very area of incidental damage, and sound policy dictates that the courts refrain from setting up competing rules on a constitutional basis.

It might be thought, on the basis of the last paragraph but one, that we should affirm the judgment on this point in spite of the trial court's

---

[20] As noted above (see fn. 14, *ante*), subdivision (c) of section 7262 makes provision for an in lieu payment of up to $10,000 in certain circumstances.

erroneous approach because the result to be reached under a proper interpretation of the Relocation Assistance Act is identical to that reached by the trial court. "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason." (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; see also *Blank* v. *Borden* (1974) 11 Cal.3d 963, 970, fn. 5 [115 Cal.Rptr. 31, 524 P.2d 127]; *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10].) However, we believe that in the instant case such a disposition would not be justified. Section 7262, subdivision (a) (2) of the Government Code clearly contemplates that the determination of the amount to be awarded for losses of tangible personal property as a result of discontinuance of business following condemnation is to be made, at least in the first instance, by the public entity. Moreover, the statute's provision for in lieu payments (see fns. 14 and 20, *ante*) contemplates an election by the condemnee; we would essentially foreclose that election if we were to affirm the judgment.

Finally, because this is not an action under the California Relocation Assistance Act but an action in eminent domain brought pursuant to article I, section 19, of the state Constitution, a judgment which would amount to enforcement of the provisions of the act would be inappropriate. In view of all of the circumstances we believe that the judgment should be reversed in its entirety, with directions to the trial court to undertake further proceedings leading to a new judgment in eminent domain limited in accordance with the views expressed herein. Defendant may immediately proceed to avail himself of such relief and remedies as may be available to him under the California Relocation Assistance Act.

We do not intend to imply by anything we say in this opinion that we relinquish all constitutional supervision of actions undertaken by the legislative branch in affording "fair and equitable treatment of persons displaced as a result of [public] programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole." (42 U.S.C. § 4621.) If at any time it should appear that legislative efforts in this area result in the clear infringement of constitutional rights, the courts will necessarily discharge their historic and constitutional responsibilities. What we declare and hold is that constitutional "just compensation" clauses do not and by reason of institutional realities cannot be made to perform all conceiv-

able functions in the area of providing fair treatment for persons who are deprived of their property for the public good. A substantial share of those functions, most notably those relating to incidental damages arising from a taking, must be performed by the governmental institution best designed and equipped to balance and consider the competing social policies here at work. That institution, the Legislature, has taken significant steps in this regard and manifests a continuing disposition to insure that the goal of fundamental fairness be achieved. The fact that the most recent statutory developments—i.e., those contained in the 1975 act—are by their terms inapplicable to the instant case cannot cause us to depart from what we consider to be sound judicial and constitutional policy.

To recapitulate, we hold (1) that under the law applicable to the case at bench, and in particular under pertinent *constitutional* provisions, defendant condemnee was not entitled to recover compensation either for loss of business goodwill or for the loss of value of his inventory of "ethical drugs," resulting from condemnation of the real property owned by him; (2) that accordingly the trial court did not err in concluding that he was not entitled to be compensated for loss of business goodwill; but (3) that the court did err in awarding him compensation for his inventory of ethical drugs. The judgment must therefore be reversed, but we find nothing in the record impelling us to order a new trial. The case was fully tried and we apprehend no necessity to take further evidence. On remand the court should make findings of fact and conclusions of law in conformity with the views herein expressed and enter judgment accordingly.

The judgment is reversed and the cause is remanded to the trial court to proceed with the disposition thereof under the directions and in conformity with the views herein expressed. Defendant shall recover his costs on plaintiff's appeal; plaintiff shall recover its costs on defendant's appeal.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Richardson, J., concurred.

The petition of the defendant and appellant for a rehearing was denied February 11, 1976.