[No. B215465. Second Dist., Div. Four. Aug. 5, 2010.]

LOS ANGELES UNIFIED SCHOOL DISTRICT, Plaintiff and Respondent,
v.
RUDY CASASOLA et al., Defendants and Appellants.

**COUNSEL**

Callanan, Rogers & Dzida and Joseph S. Dzida for Defendants and Appellants.

Oliver, Sandifer & Murphy, Connie Cooke Sandifer and Cynthia C. Marian for Plaintiff and Respondent.

**OPINION**

**SUZUKAWA, J.**—Respondent Los Angeles Unified School District (the District) acquired by eminent domain property on which appellants Rudy and Teresa Casasola (the Casasolas) operated a small business. The Casasolas relocated their business to· a new, larger property and spent nearly $1.4 million moving their equipment and repurposing the new property to accommodate their business. They then sought reimbursement from the District for their relocation expenses. The District paid the Casasolas $224,252 in moving and reestablishment expenses, but rejected the remainder of the claim.

The Casasolas challenge this determination on appeal, contending that their reasonable relocation expenses are reimbursable as expenses incurred to mitigate loss of business goodwill. They also challenge the trial court's award to the District of $180,000 in penalties, contending that the penalties are unconscionable. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

I.  *The Eminent Domain Complaint*

The Casasolas are the owners of a catering truck supply company (referred to as Rudy's Wholesale or Western Catering). Until October 2007, the

catering supply company was located on the 4600 block of Western Avenue in Los Angeles (the property or the Western Avenue property).

On April 26, 2006, the District filed an eminent domain complaint seeking to condemn the property. The Casasolas answered, claiming, among other things, the right to compensation for loss of business goodwill under Code of Civil Procedure section 1263.510 (section 1263.510).

II. *The Casasolas' Purchase of Replacement Property and Their Attempts to Vacate the Western Avenue Property*[1]

The Casasolas purchased a replacement property located at 6236 South St. Andrews Place (the St. Andrews property). The St. Andrews property was much larger than the Western Avenue property, and it required considerable reconfiguration to accommodate the Casasolas' catering business.[2] The Casasolas had difficulty getting the work permitted and completed, and they repeatedly requested additional time to remain on the property.

On August 30, 2007, the parties signed a stipulation giving the Casasolas until September 4 to vacate the property (the August stipulation). In relevant part, the stipulation provided: "Casasola may continue to occupy its premises at the Subject Property until no later than 7:00 a.m. on September 4, 2007, on the terms and conditions set forth herein. District will not enforce the Order for Prejudgment Possession as against Casasola until such time and date provided that Casasola has complied with the terms of this Stipulation. Casasola stipulates it will not move to stay the Order. [*Handwritten*:] However, Casasola may stay until September 9, 2007, but $5,000 shall be deducted from the compensation paid by District to Casasola for each day (or partial day) Casasola remains on the property after September 4, 2007."

In mid-September 2007, the Casasolas asked for additional time to vacate the property because the work on the St. Andrews property was not yet

---

[1] In accordance with the substantial evidence standard of review, we recite the facts established by the record viewed in the light most favorable to the judgment, giving the District the benefit of every reasonable inference and resolving any conflicts in the evidence in support of the judgment. (*612 South LLC v. Laconic Limited Partnership* (2010) 184 Cal.App.4th 1270 [109 Cal.Rptr.3d 780].)

[2] For example, the Casasolas contend as follows: "The primary access to the [St. Andrews] property was over a driveway whose rights were licensed from the Los Angeles Department of Water and Power. The license had been in existence for over a decade, but when [the Casasolas] purchased the property DWP pulled the license and would not agree to renew it. As a result, [the Casasolas] had to negotiate new access from adjacent landowners, which took many months, and [the Casasolas] had to completely reconfigure the relocation site in light of the new access and the fact that the site, as reconfigured, could accommodate much less catering truck traffic from [the Casasolas'] catering truck customers." (Fn. omitted.)

complete. They also asked the District to waive the $5,000 per day penalty imposed under the August 30 stipulation. On September 21, 2007, district relocation program manager Mort Bernstein and relocation specialist Mary O'Toole met with the Casasolas and told them that the District would be willing to forgive the $5,000 per day penalty if the Casasolas agreed to vacate the property by September 30, 2007. The Casasolas agreed to do so.

On September 28, 2007, the Casasolas contacted O'Toole and asked to remain on the property after September 30. The District refused the request. At the end of the day on September 28, Mr. Casasola told O'Toole that he would tell his drivers that the business would be closed as of September 30, and that O'Toole could pick up the keys to the premises on Monday, October 1. O'Toole reminded the Casasolas that if they did not vacate the property by September 30, "the verbal agreement was null and void."

The Casasolas did not vacate the property on September 30 as agreed. They remained in possession of the property until October 10, when they finally relinquished the keys to O'Toole.

## III.   *The Casasolas' Mitigation Claim*

The Casasolas filed a "Statement Regarding Expense of Mitigation to Avoid Loss of Business Goodwill" (Mitigation Statement) on May 12, 2008. They asserted that a displaced property owner must take steps to mitigate losses, including loss of goodwill, pursuant to section 1263.510, and that expenses associated with mitigation are compensable as lost goodwill pursuant to *People ex rel. Dept. of Transportation v. Muller* (1984) 36 Cal.3d 263 [203 Cal.Rptr. 772, 681 P.2d 1340] (*Muller*) and *Redevelopment Agency v. Arvey Corp.* (1992) 3 Cal.App.4th 1357 [5 Cal.Rptr.2d 161] (*Arvey*). Accordingly, the Casasolas asserted that they were entitled to be reimbursed for the following mitigation expenses incurred in connection with repurposing the St. Andrews property for their catering business (rounded to the nearest dollar):

| | |
|---|---|
| Professional consulting fees: | $216,127 |
| Architectural plans (Marta Perlas): | $32,465 |
| Electrician (Stephan Jones): | $69,330 |
| General contractor (Isaac Carvajal): | $243,900 |
| Survey plans (RS Engineering): | $9,400 |
| Roofing (Millenium Roofing): | $21,500 |
| Plumbing (K Plumbing): | $96,008 |
| Tile (Manuel Morones): | $36,069 |

| | |
|---|---|
| Architect (MVA Architects): | $79,717 |
| Plumbing (Manuel Chamul Plumbing): | $43,798 |
| Office finishing (Cristopher Gutierrez): | $27,227 |
| Home Depot: | $13,898 |
| Willy Garcia: | $7,200 |
| Bruce Miller: | $25,691 |
| Fred Taylor: | $57,737 |
| Refrigeration (Rite MP Refrigeration): | $20,000 |
| Elevator (Metropolitan Elevator): | $15,000 |
| Ronald Greene: | $231,198 |
| APS Refrigeration Cold Container: | $6,789 |
| Martin Arana: | $14,800 |
| Department of Water and Power License Fee: | $7,354 |
| Engineering (R.P.M. Engineering): | $2,060 |
| M.R.L. Development: | $63,005 |
| Counter work (Erick Sologaitoa): | $7,000 |
| Alarm system (ADT Security): | $8,000 |
| TOTAL: | $1,355,273[3] |

Of these alleged mitigation expenses, the Casasolas asserted that the District had paid or agreed to reimburse them for $213,252 in "moving expenses," $10,000 in "reestablishment expenses," and $1,000 in "searching expenses." Further, the District had disallowed $470,010, which it categorized as unreimbursable reestablishment expenses. The Casasolas did not discuss the status of the remaining $661,011 in unpaid claims. The Casasolas claimed that all expenses for which the District had not reimbursed them or agreed to reimburse them (i.e., the $470,010 in disallowed claims and the $661,011 in claims not yet acted upon) were compensable as expenses to mitigate loss of goodwill.

IV. *The District's Motion to Exclude Evidence of the Casasolas' Claimed Mitigation Expenses*

On June 27, 2008, the District filed a "Motion for Determination of Admissibility/Compensability of Mitigation Expenses in an Eminent Domain Action." The District asserted that the Casasolas should not be permitted to

---

[3] In their Mitigation Statement, the Casasolas did not provide any detail about the work done by the various contractors, consultants, or suppliers.

testify at trial about the sums they had expended to reestablish their business at the St. Andrews property because (1) they were entitled under section 1263.510 to be compensated for lost goodwill, but not for "mitigation expenses," i.e., expenses to mitigate loss of goodwill; (2) the Casasolas' claimed mitigation expenses exceeded by more than $1 million the potential losses they sought to mitigate;[4] (3) relocation expenses are compensable in a separate administrative proceeding, not in an eminent domain action; and (4) permitting evidence of the Casasolas' claimed mitigation expenses would be time consuming and prejudicial.

The Casasolas opposed the motion. They contended (1) California law recognizes the right to recover mitigation costs in eminent domain cases; (2) mitigation costs are compensable even when mitigation efforts do not succeed; (3) the burden of proving lack of reasonableness is on the party causing the damage, not the property owner; (4) mitigation costs are reimbursable even if they exceed the damages prevented or reasonably anticipated; and (5) they were not seeking a double recovery because they were "not seeking to recover benefits that could be awarded under the relocation regulations. The School District has denied their request for reimbursement of these costs under those regulations."

The trial court granted the motion to exclude evidence of relocation expenses. It said: "[T]o the extent that [the Casasolas] expended extraordinary amounts of money in obtaining and having alternative locations, those are not compensable, as they are relocation expenses, not an adequate measure of goodwill, not a goodwill aspect that was contemplated in any way, shape or form by even accepting the high number of goodwill of . . . $126,000. Even if I deemed it to be some sort of a number that should be considered[,] . . . it would have been wholly irrational for someone to spend a million dollars to save a business worth $126,000. More significantly and importantly, if you look at what elements of damages are allowed to be claimed, that type of expense is separately compensable under an entirely separate statutory scheme but not under the law of eminent domain. The cases on which Mr. Casasola relies really are distinguishable, because to the extent a mitigation expense is considered at all, it's really considered as part of a computation of goodwill discount, but that was not in fact done in this case, nor properly could it have been."

The court continued: "Where you have a business with $125,000 of goodwill that has been operating out of a 6,000 square foot location . . . it strains credulity [to spend a million plus to preserve goodwill] because . . .

---

[4] According to Robert R. Trout, the Casasolas' appraiser, the value of the business's goodwill prior to the taking was $126,000. He opined that there was a total loss of goodwill as a result of the taking and relocation.

honestly, no rational economic actor would continue to operate a business. If I have to spend a million-two to save $126,000, I close down and I say my goodwill is my goodwill, the value of my business is the value of my business, pay me, case closed. But imagine there is a premium that can be extracted for saving what is otherwise a noneconomic decision under the guise of goodwill, I think, as a matter of law, [that] is impermissible."

The court concluded: "I'm going to preclude from admission in the jury trial the evidence of just compensation set forth in exhibit 1C attached to the plaintiff's motion. These expenses are not legally cognizable under [section] 126[3.]510 as a component of lost goodwill. Plaintiff's own estimate of goodwill is less than $130,000. [The] [c]ourt finds as a matter of law, as I think the court is required to do, that a reasonably prudent person would not have undertaken expenses in excess of 1.4 million in preserving that goodwill. That is subpart (a)(2) of that same section. These are relocation expenses for which reimbursement may be sought under the Government Code once plaintiff's administrative remedies have been exhausted."

## V. *The Partial Settlement Agreement*

On September 19, 2008, the parties filed a "Stipulation Re: Agreed Upon and Reserved Issues." It provided as follows:

(1) "[T]he parties have agreed to settle the fair market value of the real estate for $1,259,000, the fair market value of the improvements pertaining to realty for $276,091, and the fair market value of the loss of goodwill for $63,000, for an aggregate sum of $1,598,091, upon which the Casasolas will be entitled to statutory interest and costs. The sums already released from the court deposit to, or for the benefit of, the Casasolas in the amount of $1,442,557 shall be credited against the agreed upon settlement amount."

(2) "Three reserved issues are not included in this settlement. First, [the District] specifically reserves its rights pursuant to the Stipulation Re: Possession, Removal of Items and Writ of Assistance on file herein. . . . [¶] . . . [¶] Second, [the] Casasolas specifically reserve the right to pursue additional relocation benefits, if any, separately from this eminent domain action. The sums paid to the Casasolas for relocation thus far shall not be credited against the settlement sum outlined above. [¶] Third, the Casasolas reserve the right to appeal from the judgment to be entered herein, based upon the July 23, 2008 ruling by this court regarding the claims the Casasolas[] refer to as mitigation/goodwill."

## VI. *Trial and Judgment*

The Casasolas filed a "Trial Brief on Penalty Issues and Jury Trial of Penalty Issues" on September 24, 2008. They asserted that the District was

attempting to enforce the penalty provision in the August 30 stipulation by deducting from the Casasolas' eminent domain compensation the $5,000 per day penalty the District claimed the Casasolas owed them. The Casasolas asserted that this was improper because the District had waived the penalty or was estopped to assert it, and the penalty was unreasonable, unconscionable, and contrary to public policy.

The District filed a responsive brief on September 26, 2008. It contended that it had not waived the penalty, the stipulation was not unconscionable, and the issue should be tried to the court, not a jury.

The parties tried the reserved issues to the court on January 5, 2009.[5] On January 6, 2009, the court awarded the District $180,000, representing a penalty of $5,000 per day for 36 days.

In its proposed statement of decision, the court found that in August 2007, the District had advised the Casasolas that it could no longer grant any further requests to remain on the property and that it required possession by no later than September 4, 2007. Following further discussion, the parties entered into a stipulation on a number of issues, including an agreement that the Casasolas would vacate the property no later than September 4, 2007. As handwritten in by the Casasolas' counsel, if the Casasolas remained on the property after September 4, they would be required to pay a daily charge of $5,000, until September 9, 2007, when they were to be off the property.

"After the parties entered into the stipulation, the credible testimony of Mary O'Toole established that the defendants were unable to vacate the premises by September 4, 2007. O'Toole further credibly testified that Mrs. Casasola contacted her to see if it would be possible to negotiate a further extension of the time in which defendants could move from the subject property. O'Toole and Bernstein credibly testified that the defendants' request was discussed and that a decision by the District was made to allow the defendants to leave on September 30, 2007 and to allow the daily rent of $5,000 to be waived, if the defendants were moved from the subject property on or before September 30, 2007. O'Toole further credibly testified that no further offers or promises were made by the District to the defendants.

"Defendants' testimony that they were promised that nothing would be done were they to vacate the premises in October was wholly not credible.

---

[5] At the beginning of the proceeding, the court stated that the Casasolas were not entitled to a jury trial on those issues because, in an eminent domain case, the only issue as to which there is the right to a jury trial is "the question of the fair market value of the award . . . . All other questions of fact or mixed questions of facts [and] law are to be tried without reference to a jury." Thus, because the reserved issues were "collateral issue[s] regarding the enforceability of a stipulation entered into between the parties within the context of an eminent domain action," there was no right to a jury trial.

The defendants' testimony was vague. Neither [was] able to recall critical events and their demeanor during their testimony supports the court's conclusion that their statements are lacking in veracity. In addition, critical portions of Mr. Casasola's testimony regarding the district's actions directly contradicted his prior sworn declarations.

"Corroborating O'Toole's version of events is the District's own contemporaneous conduct to ensure the removal of defendants from the subject property. In October, the Sheriff posted the Writ of Assistance on the subject property and scheduled the defendants' eviction for October 11, 2007. Notified of the impending eviction, the defendants left the subject property on October 10, 2007.

"It is uncontroverted that the defendants did not vacate the subject property on or before September 30, 2007. Accordingly, the condition precedent to the oral modification of the parties' stipulation, i.e., that the defendants would vacate the subject property by no later than September 30, 2007, was not met. Accordingly, as the condition precedent was not satisfied, the oral modification of the parties' previous stipulation has no legal force or effect.

"Nor does the District's effort to accommodate the Casasola[s] by extending a conditional extension constitute a waiver. There is nothing in the record to suggest that the District ever offered or agreed to waive the penalty, even if the Casasolas remained after September 30th.

"Under the original stipulation, the defendants were required to pay $5,000 per day for every day that they remained at the subject premises after September 4, 2007. It is uncontroverted that the defendants remained on the premises for 36 days after September 4, 2007. Under the express, obvious and clear terms of the parties' own agreement, the defendants are required to pay the District $180,000.

"This amount is to be deducted from any compensation paid by the District to the defendants. The term 'compensation,' as used by defendants' counsel's handwritten amendments to the original proposed stipulation, is not further defined or specified. There can be no estoppel where the District's only conduct was to defer payment until the underlying dispute regarding the parties' obligations under the stipulation could be resolved. The District's decision not to take unilateral action to deduct this amount until this matter was fully adjudicated does not operate to estop the collection of those monies at this time.

"Moreover, there is nothing in the parties' stipulation (which was, in relevant part, drafted by defendants' own attorney) that is contrary to law or

public policy. The parties had the ability to negotiate a mutually satisfactory resolution to their business realities. The Casasola[s] obtained more time in which to quit the premises. In exchange, the District obtained a penalty for each day that they remained after September 4, 2007 as a financial incentive to expedite the defendants' leaving the subject property and to compensate them for the delay in the project occasioned by the Casasola[s'] decision to remain on the subject property. In this case, the stipulation furthered the public interest in securing the property in a way consistent with the property rights of the owners. [¶] . . . [¶]

"As there is no uncertainty as to the intent or terms of the stipulation, and in light of the credible evidence adduced at trial, judgment shall be for the District in the amount of $180,000."

The court overruled the Casasolas' objection to the proposed statement of decision and adopted it as the statement of decision on February 25, 2009. Judgment was entered on March 16, 2009, and the Casasolas timely appealed from the judgment on April 15, 2009.

## DISCUSSION

I.  *The Trial Court Did Not Err in Rejecting the Casasolas' Claim for Expenses Incurred to Mitigate Loss of Goodwill*

The Casasolas contend that all of the expenses for which they claim reimbursement are "relocation" expenses—i.e., expenses incurred to relocate their catering business from the Western Avenue property to the St. Andrews property. They further contend that, because all the relocation expenses were incurred to avoid a loss of business goodwill, they are compensable pursuant to (1) section 1263.510, which provides that an owner of publicly acquired property shall be compensated for lost business goodwill, and (2) *Muller, supra*, 36 Cal.3d 263, which the Casasolas say holds that expenses incurred to avoid a loss of business goodwill are also compensable under section 1263.510.

The District disagrees, urging that (1) mitigation expenses are not compensable under section 1263.510, and (2) in any event, the Casasolas' claimed mitigation expenses are not compensable because they exceed by at least $1 million the Casasolas' business goodwill and, thus, are unreasonable as a matter of law.

As we now explain, under some circumstances expenses incurred to mitigate loss of business goodwill may be compensable under *Muller* and section 1263.510. However, mitigation expenses are *not* compensable under

section 1263.510 if they constitute "moving expenses" or "reestablishment expenses" as defined by Government Code section 7262 (section 7262) and California Code of Regulations, title 25, section 6090. Accordingly, because the Casasolas have not demonstrated that any of their claimed mitigation expenses are something other than "moving expenses" or "reestablishment expenses" as defined by those sections, the trial court correctly found that the Casasolas were not entitled to be compensated for them in this eminent domain proceeding.[6]

## A. The Statutory Scheme

### 1. The Eminent Domain Law

■ "The Fifth Amendment to the United States Constitution provides that 'just compensation' must be paid to a property owner whose property is taken through the government's power of eminent domain. The California Constitution provides a similar right. (Cal. Const., art. I, § 19.)" (*Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 830 [19 Cal.Rptr.3d 84].) However, the constitutional right to just compensation has been construed not to include the loss of goodwill to a business whose property is taken by the power of eminent domain. (*Ibid.*; *Community Redevelopment Agency v. Abrams* (1975) 15 Cal.3d 813, 831 [126 Cal.Rptr. 473, 543 P.2d 905].) The Legislature thus responded to this constitutional limitation by enacting section 1263.510, which recognizes a right to compensation for loss of goodwill under some conditions. In pertinent part, section 1263.510 provides:

"(a) The owner of a business conducted on the property taken, or on the remainder if the property is part of a larger parcel, shall be compensated for loss of goodwill if the owner proves all of the following:

"(1) The loss is caused by the taking of the property or the injury to the remainder.

"(2) The loss cannot reasonably be prevented by a relocation of the business or by taking steps and adopting procedures that a reasonably prudent person would take and adopt in preserving the goodwill.

"(3) Compensation for the loss will not be included in payments under Section 7262 of the Government Code.

"(4) Compensation for the loss will not be duplicated in the compensation otherwise awarded to the owner.

---

[6] Because the issue is not before us, we do not consider whether any of the Casasolas' claimed mitigation expenses might be compensable in another proceeding, including an administrative proceeding under section 7262.

"(b) Within the meaning of this article, 'goodwill' consists of the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage."

■ In recommending the enactment of section 1263.510, the Law Revision Commission explained: "Eminent domain frequently works a severe hardship on owners of businesses affected by public projects. As a rule, business losses have not been compensated. This rule of noncompensability has been widely criticized, and the Commission believes that some step should be taken to compensate the owner of a business taken or damaged in an eminent domain proceeding for losses he suffers. But, in order to assure that losses are certain and measurable for the purposes of compensation, recovery should be allowed only for the loss of goodwill proved by the property owner and only to the extent that such loss is caused by the acquisition of the property or the injury to the remainder and cannot reasonably be prevented by a relocation of the business and by taking those steps and adopting those procedures that a reasonably prudent person would take and adopt in preserving the goodwill." (Recommendation Proposing the Eminent Domain Law (Dec. 1974) 12 Cal. Law Revision Com. Rep. (1974) pp. 1652–1653, fns. omitted, quoted in *Los Angeles Unified School Dist. v. Pulgarin* (2009) 175 Cal.App.4th 101, 106–107 [95 Cal.Rptr.3d 527] (*Pulgarin*).) " 'Because section 1263.510 adopts without change the recommendations of the California Law Revision Commission, the commission's report is entitled to great weight in construing the statute and the Legislature's intent.' (*Redevelopment Agency v. Arvey Corp.*[, *supra*,] 3 Cal.App.4th [at p.] 1363, fn. 6 . . . .)" (*Pulgarin*, at p. 107.)

2. *The California Relocation Assistance Act (Gov. Code, § 7260 et seq.)*

■ The California Relocation Assistance Act, codified as Government Code section 7260 et seq., provides for administrative recovery for moving and related expenses incurred by individuals and businesses displaced by public projects. (§ 7262; *Arvey, supra*, 3 Cal.App.4th 1357.) As relevant here, section 7262 provides:

"(a) Whenever a program or project to be undertaken by a public entity will result in the displacement of any person, the displaced person is entitled to payment for actual moving and related expenses as the public entity determines to be reasonable and necessary, including expenses for all of the following:

"(1) Actual and reasonable expenses in moving himself or herself, his or her family, business, or farm operation, or his or her, or his or her family's, personal property.

"(2) Actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate the property, as determined by the public entity.

"(3) Actual and reasonable expenses in searching for a replacement business or farm, not to exceed one thousand dollars ($1,000).

"(4) Actual and reasonable expenses necessary to reestablish a displaced farm, nonprofit organization, or small business at its new site, but not to exceed ten thousand dollars ($10,000)."

■ The California Relocation Assistance Act represents a "legislative recognition of the need to compensate for certain business losses which occur as a result of a condemnation action." (*Baldwin Park Redevelopment Agency v. Irving* (1984) 156 Cal.App.3d 428, 438 [202 Cal.Rptr. 792].) However, such compensation is "independent of the condemnation proceedings." (*Ibid.*) Accordingly, the process by which a displaced property owner may seek relocation benefits is wholly administrative and "the condemning entity is vested with substantial discretion in making determinations relative to such benefits and is required to engage in a fact-finding process to determine the claimant's eligibility and the appropriate amount of benefits. Any person aggrieved by such a determination 'may have the application reviewed by the public entity.' (Gov. Code, § 7266.)" (*City of Los Angeles v. Decker* (1976) 61 Cal.App.3d 444, 451 [132 Cal.Rptr. 188].)

■ If a property owner is dissatisfied with the relocation benefits awarded by the condemning entity, he or she may seek judicial review through administrative mandamus, but may not challenge the award in an eminent domain action. "In his answer [to an eminent domain complaint], [a displaced property owner] may not allege the amount of any benefits claimed to be due him under the relocation assistance law, nor may he prove such benefits at the trial of that action. If he has been denied claimed relocation benefits, by adverse action of the condemning public entity upon its 'review' of his claim by its governing body or other appropriate authority [citations], so that he has exhausted his administrative remedy, his only judicial remedy lies in petitioning the superior court for relief in administrative mandamus . . . ." (*City of Mountain View v. Superior Court* (1975) 54 Cal.App.3d 72, 82 [126 Cal.Rptr. 358], italics omitted.)

### 3. *The Implementing Regulations (Cal. Code Regs., tit. 25, § 6090)*

The provisions of section 7262 are expanded upon in title 25, section 6090 of the California Code of Regulations (Regulations section 6090). Subdivisions (a) and (b) of Regulations section 6090 provide for reimbursement of "moving and related expenses" as follows:

"(a) . . . [¶] The moving and related expenses for which claims may be filed shall include:

"(1) Transportation of persons and property not to exceed a distance of 50 miles from the site from which displaced, except where relocation beyond such distance of 50 miles is justified;

"(2) Packing, crating, unpacking and uncrating personal property;

"(3) Such storage of personal property, for a period generally not to exceed 12 months, as determined by the public entity to be necessary in connection with relocation;

"(4) Insurance of personal property while in storage or transit; and

"(5) The reasonable replacement value of property lost, stolen or damaged (not through the fault or negligence of the displaced person, his agent, or employee) in the process of moving, where insurance covering such loss, theft or damage is not reasonably available.

"(6) The cost of disconnecting, dismantling, removing, reassembling, reconnecting and reinstalling machinery, equipment or other personal property (including goods and inventory kept for sale) not acquired by the public entity, including connection charges imposed by public utilities for starting utility service.

"(b) . . . [¶] In addition to those compensable expenses set forth in subsection (a) of this section, a displaced business concern or farm operation may file a claim for the following moving and related expenses:

"(1) The cost, directly related to displacement of modifying the machinery, equipment, or other personal property to adapt it to the replacement location or to utilities available at the replacement location or modifying the power supply.

"(2) Claims for payment under this subsection shall be subject to the following limitations:

"(A) Reimbursable costs shall be reasonable in amount.

"(B) The cost could not be avoided or substantially reduced at an alternate available and suitable site to which the business was referred.

"(3) The cost of any license, permit or certification required by a displaced business concern to the extent such cost is necessary to the reestablishment of its operation at a new location.

"(4) The reasonable cost of any professional services (including but not limited to, architects', attorneys' or engineers' fees, or consultants' charges) necessary for planning the move of personal property, moving the personal property, or installation of relocated personal property at the replacement site.

"(5) Where an item of personal property which is used in connection with any business or farm operation is not moved but is replaced with a comparable item, reimbursement in an amount not to exceed (1) the replacement cost, minus any net proceeds received from its sale, or (2) the estimated cost of moving, whichever is less."

Subdivision (i)(1) of Regulations section 6090 provides for limited reimbursement (capped at $10,000) of "reestablishment expenses," as follows:

"(1) . . . In addition to moving expense payments, a farm, nonprofit organization or small business of not more than 500 employees, shall be entitled to actual and reasonable reestablishment expenses, not to exceed $10,000.00. Reestablishment expenses shall be only those expenses that are reasonable and necessary and include, but are not limited to:

"(A) Repairs or improvements to the replacement property as required by Federal, State or local law, code or ordinance.

"(B) Modifications to the replacement property to accommodate the business operation or make replacement structures suitable for conducting the business.

"(C) Construction and installation costs for exterior signing to advertise the business.

"(D) Provision of utilities from right-of-way to improvements on the replacement site.

"(E) Redecoration or replacement of soiled or worn surfaces at the replacement site, such as paint, panelling or carpeting.

"(F) Licenses, fees and permits when not paid as part of moving expenses.

"(G) Feasibility surveys, soil testing and marketing studies.

"(H) Advertisement of replacement location.

"(I) Professional services in connection with the purchase or lease of a replacement site.

"(J) Estimated increased costs of operation during the first 2 years at the replacement site for such items as:

"1. Lease or rental charges,

"2. Personal or real property taxes,

"3. Insurance premiums, and

"4. Utility charges, excluding impact fees.

"(K) Impact fees or one-time assessments for anticipated heavy usage.

"(L) Other items essential to the reestablishment of the business."

Subdivision (i)(2) of Regulations section 6090 identifies a "nonexclusive" list of reestablishment expenses for which reimbursement is *not* available, as follows:

"(2) Ineligible expenses. The following is a nonexclusive listing of reestablishment expenditures not considered to be reasonable, necessary, or otherwise eligible:

"(A) Purchase of capital assets, such as, office furniture, filing cabinets, machinery, or trade fixtures.

"(B) Purchase of manufacturing materials, production supplies, product inventory, or other items used in the normal course of the business operation.

"(C) Interior or exterior refurbishments at the replacement site which are for aesthetic purposes, except as provided in paragraph (i)(1)(E) of this section.

"(D) Interest on money borrowed to make the move or purchase the replacement property.

"(E) Payment to a part-time business in the home which does not contribute materially to the household income."

### B. *The Limited Right to Reimbursement for Costs Incurred to Mitigate Loss of Goodwill*

As the Casasolas contend, the courts have suggested that, in some circumstances, there may be a limited right to reimbursement for costs incurred to mitigate loss of goodwill. The Supreme Court first addressed this issue in *Muller, supra,* 36 Cal.3d 263, wherein the court suggested that, in some circumstances, expenses incurred to mitigate loss of goodwill may be compensable under the eminent domain law. There, the Department of Transportation acquired through eminent domain the land on which Dr. Muller, a veterinarian, had been operating a veterinary practice and hospital. Dr. Muller purchased a nearby parcel of land on which he built a new veterinary hospital. (*Id.* at pp. 265–267.) As a result of the move, Dr. Muller succeeded in maintaining his practice's patronage—"[d]uring the months between the relocation and the trial, there was no loss of either customers or gross income" (*id.* at p. 268)—but his expenses increased, thus eliminating entirely the veterinary practice's profits. The court concluded that the lost profits were compensable as lost goodwill because "the profitability which Dr. Muller lost as goodwill is consistent with the definition of goodwill used in other contexts." (*Id.* at p. 271.) Alternatively, the increased expenses were compensable as expenses incurred to prevent loss of goodwill: "Had a suitable location not been available in Walnut Creek, Dr. Muller might well have had to move his practice farther from Walnut Creek. The result might have been the loss of some patrons. . . . If this hypothetical move had caused the same reduction in profits as Dr. Muller suffered from his actual move, he would have been entitled to at least partial compensation under the Department's definition of goodwill. . . . [I]t would be arbitrary to compensate him for the first loss but not the second." (*Id.* at p. 271, fn. omitted.)

The Court of Appeal relied on this analysis in *Arvey, supra,* 3 Cal.App.4th 1357. There, the City of Emeryville (City) acquired by eminent domain property on which Arvey Corporation (Arvey) operated an envelope business. Arvey considered purchasing a relocation site, but ultimately consolidated its Emeryville facility with an existing facility in South San Francisco. (*Id.* at p. 1360.) It then sought reimbursement for relocation expenses in the eminent domain action filed by the City. The trial court excluded evidence of move-related expenses reimbursable under section 7262, but permitted Arvey to introduce evidence of expenses not reimbursable under that section. On appeal, Arvey challenged the court's evidentiary ruling and contended that the trial court erred in instructing the jury that expenses reimbursable under section 7262 were not compensable in the present proceeding. (3 Cal.App.4th at pp. 1360–1361.)

The court cited *Muller* for the proposition that the eminent domain law requires the owner of property to take steps to mitigate the loss of goodwill, and that "[s]uch mitigation expenses then become compensable as lost goodwill." (*Arvey, supra,* 3 Cal.App.4th at p. 1361.) Accordingly, the court assumed (but did not decide) that the jury properly was permitted to compensate the property owner in the eminent domain proceeding for some mitigation expenses, including "sums spent on severance pay, shutdown costs in Emeryville after the business had moved out, travel and living expenses incurred by employees brought in to help with the move, public relations costs for retaining customers, costs for shutting down and securing the Emeryville plant once it was vacated, fees paid attorneys to negotiate with the unions and fees paid a management consultant." (*Id.* at p. 1365.)

The court held, however, that some of Arvey's claimed relocation expenses—specifically, those reimbursable as moving or reestablishment expenses under section 7262—could not be recovered in the eminent domain proceeding. In reaching this conclusion, the court specifically rejected Arvey's contention that a displaced property owner could recover relocation expenses *either* under the eminent domain law *or* the Relocation Assistance Act, so long as the expenses were recovered only once. The court explained: "At first glance, the language of subdivision (a)(3) of section 1263.510 which provides that the business owner must prove that 'compensation for the loss will not be included in payments under Section 7262 of the Government Code,' seems to preclude Arvey's position. On close reading, however, the language seems to leave open the possibility of payment under this section if Arvey could prove that its expenses for mitigating its goodwill loss would not be paid for relocation assistance by the agency under Government Code section 7262 even though the expenses were in fact in the category of expenses payable under section 7262. This reading, however, makes no sense when the subdivision is viewed in the context of section 1263.510 as a whole and of the entire statutory scheme. [¶] . . . [Thus], subdivision (a)(3) must be read to exclude all claims that are payable as relocation assistance under Government Code section 7262, even if for some other reason such claims will not actually be paid under section 7262." (*Arvey, supra,* 3 Cal.App.4th at pp. 1362–1363, italics omitted.)

The court thus held as follows: "[I]n section 1263.510, subdivision (a)(3), the phrase 'will not be included' means 'is not includable.' Therefore, subdivision (a)(3) requires Arvey to prove that compensation for the loss is not includable in payments under Government Code section 7262, i.e., is a type of loss not covered by section 7262." (*Arvey, supra,* 3 Cal.App.4th at p. 1364, italics omitted.)

C. *Application of These Principles to the Present Case*

The present case addresses an issue related to, but distinguishable from, the issue addressed in *Arvey*. There, the court considered whether a displaced property owner could recover under the eminent domain law expenditures expressly recoverable under the Relocation Assistance Act. We consider a somewhat different question: Whether a displaced property owner may recover under the eminent domain law expenditures expressly deemed *nonrecoverable* under the Relocation Assistance Act, either because they are part of a class of nonrecoverable expenses or because they exceed section 7262's $10,000 cap on reestablishment expenses. (§ 7262, subd. (a)(4).) For the reasons that follow, we conclude that a displaced property owner may not recover under the eminent domain law expenditures deemed nonrecoverable under the Relocation Assistance Act.

In interpreting a statute, our primary task is to determine the Legislature's intent. "Our first step is to scrutinize the words used in the statute and give them a plain and commonsense meaning. If the language is clear and unambiguous, there is no need for construction or for resort to indicia of the Legislature's intent. However, the literal meaning of a statute must be aligned with its purpose." (*Bode v. Los Angeles Metropolitan Medical Center* (2009) 174 Cal.App.4th 1224, 1236–1237 [94 Cal.Rptr.3d 890].) Further, " '[i]n testing a proposed interpretation we must also consult the text of associated and related statutes, attempting to identify the role of each in the larger system of laws.' . . . ' "[E]very statute should be construed with reference to all other statutes of similar subject so that each part of the law as a whole may be harmonized and given effect." [Citation.] ". . . Accordingly, statutes which are in pari materia should be read together and harmonized if possible." ' [Citation.]" (*People v. Mgebrov* (2008) 166 Cal.App.4th 579, 587 [82 Cal.Rptr.3d 778].)

Although Code of Civil Procedure section 1263.510 and Government Code section 7262 were codified in separate codes, they concern related subject matters. That is, section 1263.510 addresses compensation for lost goodwill when property is taken by eminent domain, while section 7262 addresses compensation for relocation costs incurred as the result of an eminent domain action. Moreover, section 1263.510 specifically references section 7262, stating that loss of goodwill is compensable if a displaced property owner proves, among other things, that "[c]ompensation for the loss will not be included in payments under Section 7262 of the Government Code." (§ 1263.510, subd. (a)(3).) Therefore, we must "read these statutes together and harmonize them if possible." (*Bode v. Los Angeles Metropolitan Medical Center, supra*, 174 Cal.App.4th at p. 1237.)

■    Section 7262 expressly provides that moving expenses incurred in connection with an eminent domain action are fully compensable so long as they are "actual" and "reasonable," but reestablishment expenses, even if "actual" and "reasonable," are compensable only up to $10,000. (§ 7262, subd. (a)(1), (4).) Regulations section 6090 clarifies this distinction by identifying expenses properly categorized as "moving . . . expenses" and "reestablishment expenses."[7]

Were we to interpret section 1263.510 as the Casasolas would have us do—i.e., to mean that all actual and reasonably incurred relocation expenses are compensable, whether they are "moving expenses" or "reestablishment expenses"—we would render meaningless the carefully drawn statutory distinctions between these categories of expenses. This we cannot do. (*Bode v. Los Angeles Metropolitan Medical Center, supra,* 174 Cal.App.4th at p. 1237.)

■    The Casasolas contend that, under *Muller,* we must liberally construe the goodwill recovery statute and, where its meaning is unclear, we must construe it to " 'extend the remedy.' " They are correct that *Muller* establishes this general principle, but the principle does not apply here, where there is an express statutory mandate to the contrary. While we do not know why the Legislature chose to make moving expenses fully compensable but to cap reestablishment expenses at $10,000, we "cannot second-guess the way in which the Legislature fashions a statutory remedy, since that is a public policy issue properly left to the Legislature." (*People v. Limon* (2009) 179 Cal.App.4th 1514, 1519 [102 Cal.Rptr.3d 580].)    ■    Accordingly, we conclude that the trial court properly found that the Casasolas' moving and reestablishment expenses are not compensable in this eminent domain proceeding. Because the Casasolas have not established, either in the trial court or on appeal, that any of their claimed "mitigation" expenses are neither "moving" nor "relocation" expenses, we affirm the trial court's order excluding evidence of those expenses in the eminent domain trial.

II.   *The Trial Court Did Not Err in Enforcing the Stipulated $5,000 Per Day Penalty*

The Casasolas contend that the trial court erred in enforcing the $5,000 per day penalty to which the parties stipulated in the August agreement. They

---

[7] For example, as defined by Regulations section 6090, "disconnecting, dismantling, removing, reassembling, reconnecting and reinstalling machinery, equipment or other personal property" is a "moving expense," while "[m]odifications to the replacement property to accommodate the business operation" is a "reestablishment expense." Similarly, "[t]he reasonable cost of any professional services . . . necessary for planning the move of personal property" is a "moving expense," while "[p]rofessional services in connection with the purchase or lease of a replacement site" is a "reestablishment expense."

argue that the penalty is unconscionable and an evasion of the constitutional duty to pay just compensation for property taken by eminent domain. They also urge that the issue should have been decided by a jury, not the court. For the reasons that follow, we reject both contentions.

### A. Enforcing the Stipulated Penalty Is Not Unconscionable

The Casasolas assert that the stipulated $5,000 per day penalty is unenforceable because it is unconscionable and an evasion of the constitutional duty to provide just compensation for property taken by eminent domain. However, while they cite some authority for the proposition that a court may refuse to enforce an unconscionable contract, they do not provide any legal authority for their assertion that the specific penalty provision at issue here is unconscionable. Accordingly, we may treat the claim as forfeited. (*People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 879 [106 Cal.Rptr.3d 560] [" 'An appellate brief "should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as [forfeited], and pass it without consideration." ' "]; *People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481] [same].)

On the merits, we find the Casasolas' unconscionability claim to be without legal or factual support. " ' "[U]nconscionability has both a 'procedural' and a 'substantive' element," the former focusing on " 'oppression' " or " 'surprise' " due to unequal bargaining power, the latter on " 'overly harsh' " or " 'one-sided' " results . . . .' " (*D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 868 [98 Cal.Rptr.3d 300], italics omitted.) "Procedural unconscionability focuses on the making of the agreement. Oppression results from unequal bargaining power, when a contracting party has no meaningful choice but to accept contract terms. Unfair surprise results from misleading bargaining conduct or other circumstances indicating that a party's consent was not an informed choice. [Citation.]" (*Dotson v. Amgen, Inc.* (2010) 181 Cal.App.4th 975, 980 [104 Cal.Rptr.3d 341].)

The trial court's factual findings, which the Casasolas do not challenge, are inconsistent with a finding of oppression: According to the court, the parties "had the ability to negotiate a mutually satisfactory resolution to their business realities. The Casasola[s] obtained more time in which to quit the premises. In exchange, the District obtained a penalty for each day that they remained after September 4, 2007 as a financial incentive to expedite the defendants' leaving the subject property and to compensate [it] for the delay in the project occasioned by the Casasola[s'] decision to remain on the

subject property." There also is no evidence of unfair surprise. The Casasolas were represented by counsel when the stipulation was signed, and the penalty provision was obvious on the face of the stipulation. Moreover, the trial court found (and the evidence appears undisputed) that the penalty provision was handwritten into the stipulation by the Casasolas' own attorney. Thus, the penalty provision is not procedurally unconscionable.

### B.   *The Casasolas Were Not Entitled to a Jury Trial on the Penalty Issue*

The Casasolas contend finally that they were entitled to a jury trial on the issue of whether the District, by its conduct, waived the penalty provision. The District disagrees, contending that in an eminent domain action, a jury decides only the amount of compensation, while the trial court determines all other issues. The District is correct.

In an eminent domain action, a property owner " 'is entitled to a jury trial on the issue of just compensation' "—i.e., " 'the fair market value of the property taken' " (§ 1263.310). (*Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954, 971, 965 [62 Cal.Rptr.3d 623, 161 P.3d 1175].) However, because a condemnation suit is a special proceeding, " 'all issues except the sole issue relating to compensation[] are to be tried by the court,' including, 'except those relating to compensation, the issues of fact.' (*People v. Ricciardi* [(1943)] 23 Cal.2d [390,] 402 [144 P.2d 799].)" (*Metropolitan Water Dist., supra,* at p. 971.) Accordingly, " ' "[i]t is only the 'compensation,' the 'award,' which our constitution declares shall be found and fixed by a jury. All other questions of fact, or of mixed fact and law, are to be tried, as in many other jurisdictions they are tried, without reference to a jury." ' [Citation.]" (*Ibid.*)

The Casasolas concede that the court tries all issues other than just compensation in an eminent domain action, but they contend that the enforceability of the penalty provision was a compensation issue because "[t]he District was awarded a set off against the amount of compensation it pa[id]; i.e[.,] the $5,000 penalty." We do not agree. As we have said, as defined by section 1263.310, just compensation is "the fair market value of the property taken." Because the enforceability of the stipulated penalty is irrelevant to fair market value, it is a question for the court, not a jury. The trial court did not err in so concluding.

## DISPOSITION

The judgment is affirmed. The District shall recover its costs on appeal.

Willhite, Acting P. J., and Manella, J., concurred.

A petition for a rehearing was denied August 27, 2010, and appellants' petition for review by the Supreme Court was denied November 17, 2010, S186252.