Filed 12/18/13  Hammer v. Hammer CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEVEN B. HAMMER, as Executor, etc., | B243409 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC052930) |
| v. | |
| MICHAEL K. HAMMER, | |
| Defendant and Respondent. | |

APPEAL from judgment of the Superior Court of Los Angeles County, David S. Milton, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Law Office of Lisa MacCarley and Lisa MacCarley for Plaintiff and Appellant.

Law Offices of Robert A. Graham, Jr. and Robert A. Graham, Jr. for Defendant and Respondent.

_____

**INTRODUCTION**

Plaintiff and appellant, Steven B. Hammer (Steven), Executor of the Estate of Charles B. Hammer, deceased (Charles), appeals certain portions of a judgment on an accounting in an action to partition real property held as tenants in common with Charles' brother Michael K. Hammer (Michael).[1] Charles' and Michael's mother, Carol Hammer (Carol), owned and resided at the real property in question until her death in 2008. For approximately 10 years prior to her death, Carol required assistance with her daily living activities. At different times during this period, Charles and Michael lived with their mother, provided her with in-home care, and assumed responsibility for managing Carol's financial affairs. This included opening a line of credit secured by the subject real property, which, at the time of Carol's death, constituted an approximately $243,000 encumbrance. After Carol's death, the property was transferred to Charles and Michael, who took ownership as tenants in common.

Soon after, a dispute arose between the brothers over the line of credit and rents derived from the property. Failing to reach a resolution between themselves, the brothers opted to litigate their dispute in the instant action. While the action was pending, Charles passed away and Charles' son, Steven, substituted into the litigation as the personal representative of his father's estate. In lieu of testimony, the parties submitted written accountings and evidence to the trial court, upon which the court entered a judgment partitioning the property and ordering certain surcharges against Charles' estate and Michael, respectively. Steven, as executor of Charles' estate, challenges certain portions of the judgment in this appeal.

Steven principally contends that the trial court lacked jurisdiction to order the surcharges against Charles' estate because Michael failed to file a creditor's claim as prescribed by Probate Code section 9370 after Charles' death. Contrary to Steven's contention, our Supreme Court has long recognized that a judgment is not void for failure

---

[1] Because the parties share the same last name, we refer to the parties' first names when referring to them individually.

to present a claim to the estate's executor, and such a judgment should not be reversed unless the failure to file a claim was first raised in the trial court. As we shall explain, Steven forfeited this objection by failing to preserve it in the trial court.

However, because it was undisputed that Michael drew $52,000 from the line of credit and distributed those amounts to his children—a distribution which, contrary to the trial court's finding, was not authorized by Carol's trust—we will reverse and remand with directions to modify the judgment to surcharge Michael for this amount plus interest. On remand, the trial court is further directed to calculate the total surcharges plus interest to be charged against each party, to offset such amounts, and to enter judgment against the party having a remaining surcharge. In all other respects the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

1.  *The Burbank Property, Carol's Declining Health and the Carol Virginia Hammer Living Trust*

For most of her adult life, and until her death in 2008 at the age of 98, Carol owned and resided in a house located in Burbank, California (the Burbank Property). In 1996, Charles and his wife moved into the Burbank Property after they lost their home due to business failure.

Beginning in 1998, Carol's health began to decline. Among other things, Carol suffered from macular degeneration, a condition that causes blindness. The same year, Charles and his wife began providing Carol with day-to-day care and living assistance. Charles also assumed responsibility for managing Carol's financial affairs.

---

[2]   Consistent with the substantial evidence standard of review, we recite the facts established by the record in the light most favorable to the judgment, giving Michael the benefit of every reasonable inference and resolving any conflict in the evidence in support of the judgment. (*Los Angeles Unified School Dist. v. Casasola* (2010) 187 Cal.App.4th 189, 194, fn. 1.)

On July 12, 2001, Carol created and executed the Carol Virginia Hammer Living Trust (the Trust) and transferred the Burbank Property to the Trust. Carol was the settlor, initial beneficiary, and initial trustee of the Trust. The Trust appointed Charles and Michael to serve as co-alternate successor trustees upon Carol's death or incapacity.

With respect to the distribution of Carol's trust estate, the Trust provides: "I CAROL VIRGINIA HAMMER upon my death give the entirety of the estate, whether real, personal or mixed . . . to my children CHARLES B. HAMMER and MICHAEL K. HAMMER equally, share and share alike."

Beginning in 2004, Michael began sharing responsibility for Carol's care. This required Michael to travel back and forth, for two weeks at a time, between his home in southern Oregon and the Burbank Property. In December 2006, Michael's vehicle broke down while traveling home from visiting his mother. At that time, Michael, Charles and Carol decided that Michael would take ownership of Carol's 2001 Chevrolet van. Title to the van was held in Charles' name until Charles transferred it to Michael in January 2007.

In June 2007, Michael moved into the Burbank Property. From then until Carol's death in October 2008, Michael was completely responsible for Carol's care, except for some services that were provided by care workers who Michael hired and supervised.

2. *The Line of Credit and Life Insurance Distributions*

In June 2005, when Charles was responsible for managing Carol's finances, Carol obtained a $100,000 line of credit from Wells Fargo, which was secured by the Burbank Property. After learning about the line of credit, Michael spoke with Charles several times about the encumbrance on the Burbank Property. Charles eventually admitted to Michael that approximately $12,000 had been used to paint the house and apartments on the Burbank Property, while Charles used the remainder of the $100,000 for his personal expenses.

4

After learning about the line of credit, Michael also discovered that in 2003 and 2004, a total of $29,000 had been liquidated from an Anchor National Life Insurance policy held by Carol. Charles never accounted for the proceeds, which Michael believed were used by Charles and his wife for their personal expenses.

These discoveries led to suspicion that Charles was not properly managing Carol's finances. Charles ultimately was relieved of responsibility for managing Carol's financial affairs, and those responsibilities were assumed by Carol's granddaughter and Michael in June 2006.

In November 2007, the line of credit was increased to $250,000 and a new deed of trust was recorded on the Burbank Property in favor of Wells Fargo.

Around early-2008, Michael began making plans to move Carol from Burbank to his home in Oregon. The anticipated move required Michael to make some additions to his house before Carol could live with him. In connection with these plans, in January 2008, Michael drew $52,000 from the line of credit, which he deposited in his personal account. However, Carol's condition soon worsened and the planned move was abandoned. The $52,000 remained in Michael's account until Carol's death, at which time Michael distributed a portion of the funds to his children (Carol's grandchildren).

On October 3, 2008, the day Carol passed away, Michael drew an additional $90,000 from the line of credit. Michael maintained that these funds were taken as compensation for the care he provided to his mother.

3. *The Partition Action and Charles' Death*

After Carol's death, Charles and Michael became co-successor trustees under the Trust. On November 13, 2008, Charles and Michael transferred the Burbank Property from the Trust to themselves as tenants in common pursuant to the Trust's terms of distribution. At the time of the transfer, the Burbank Property was encumbered by a deed of trust in favor of Wells Fargo securing the $250,000 line of credit, approximately $243,000 of which was in use.

5

What appears to have been a simmering dispute between the brothers over the management of Carol's finances boiled over after the Burbank Property was transferred into their names. The brothers failed to settle the dispute between themselves and, on April 28, 2010, Charles filed a complaint against Michael for partition of the Burbank Property and an accounting.[3] Charles alleged that Michael wrongfully took each of the $52,000 and $90,000 line of credit advances without Charles' knowledge, permission or consent. The complaint prayed for partition by sale of the Burbank Property, an accounting between Charles and Michael, and payment by Michael to Charles of all amounts found due as a result of the accounting.

On September 3, 2010, Michael filed his answer and cross-claims against Charles. Michael alleged that Charles had failed to account for the $100,000 line of credit advance, as well as various other items of income (such as rents, investment income and Carol's pension and social security payments), and several items of personal property, including jewelry, photographs, fine china, artwork and coin, animated cell, and comic book collections. Michael likewise prayed for an accounting and payment by Charles to Michael of all amounts found due as a result of the accounting.

On October 27, 2010, while the partition action was pending, Charles passed away. On January 7, 2011, Letters Testamentary were issued appointing Steven as executor of the Estate of Charles B. Hammer (Charles' Estate). On May 18, 2011, Steven moved for an order substituting himself, as executor and personal representative, for Charles as plaintiff in the partition action. On June 17, 2011, the trial court entered the requested order for substitution.

---

[3] The complaint also named Wells Fargo as a defendant. Charles and Michael later stipulated to excuse Wells Fargo from participation in the litigation. In their stipulation, Charles and Michael agreed that the Wells Fargo lien would be fully satisfied from the proceeds of the partition sale.

6

4.    *The Interim Judgment for Partition and the Parties' Accountings*

On November 30, 2011, the trial court entered an order on the parties' stipulation requiring Steven and Michael to "prepare accountings of the rental proceeds, loan proceeds (as it pertains to the Wells Fargo Line of Credit), and any other funds or assets belonging to Carol V. Hammer which came into [Charles' and Michael's] control and/or possession." Such accountings were to be submitted in lieu of trial testimony.  The same day, the court entered an "interlocutory judgment" finding that Charles' Estate and Michael were each the owner of an undivided one-half interest in the Burbank Property.  The interlocutory judgment appointed a referee and ordered the Burbank Property to be partitioned by sale with the resulting proceeds to be applied to pay, among other things, the approximately $243,000 owing on the Wells Fargo line of credit.  The remainder of the proceeds were to be awarded to Charles' Estate and Michael in severalty according to their respective interest.

On December 9, 2011, Steven filed his accounting for the $100,000 line of credit advance.  The accounting included various summaries of Carol's estimated income and expenses.  These summaries were largely based upon excerpts from Carol's individual tax returns for the years 2005, 2006 and 2007.[4]  Based on these estimates, Steven's accounting purported to show that Carol's expenditures for the three-year period exceeded her income by more than $90,000, which he argued accounted for the $100,000 credit advance. However, Steven's accounting did not show when the $100,000 in question was drawn against the line of credit, nor did it match Carol's expenditures to any line of credit advance taken during Charles' stewardship of Carol's finances.

The same day, Michael filed a "Trial Brief" and supporting declaration to account for the $52,000 and $90,000 advances taken while he was responsible for managing Carol's finances.  Michael's brief and declaration also addressed Steven's contention that

---

[4]    The exception was Carol's "estimated annual expenditures for non-deductible items such as food, toiletries, incontinent pads, transportation, and other costs associated with daily living."  As for these items, Steven simply estimated that Carol's daily living needs would require expenditures of $2,000 per month, or $24,000 per year.

7

Charles' Estate was entitled to a credit for the van that had been transferred to Michael in 2007. With respect to the $52,000 advance, Michael's declaration explained that these funds were originally drawn to make home improvements that were required before Carol could move in with him. When those plans fell through due to Carol's declining health, Michael stated that the funds were "distributed to the grandchildren of Carol Hammer, pursuant to her trust." As for the $90,000 advance, Michael maintained that this was taken as compensation for the care he provided Carol from 2004 until her death in 2008. Finally, Michael explained that he, Charles and Carol had mutually agreed that the van would be transferred to Michael to facilitate his visits with Carol.

On January 6, 2012, Steven filed a response to Michael's brief and declaration. Steven maintained that Michael had failed to account for the line of credit advances because (1) the Trust did not provide for any part of Carol's estate to be transferred to her grandchildren and (2) there had never been any agreement that Michael would receive $90,000 as compensation for caring for his mother. Steven's response also stated that "[t]he Executor is not seeking an additional surcharge for the automobile, which he acknowledges was offered to Michael by Charles."

On January 10, 2012, Michael filed his "objection" to Steven's accounting. Michael's objection noted that Steven had failed to account for the several items of personal property, including jewelry, photographs, artwork, etc., that Michael had demanded Charles account for in his cross-claim. Michael's declaration also attached two form 1099s from Anchor National Life Insurance for 2003 and 2004 showing that a total of $29,000 had been liquidated from Carol's life insurance policy while Charles was in charge of Carol's finances. Michael claimed that Charles had never accounted for these insurance proceeds. Finally, with respect to the $100,000 line of credit advance, Michael testified that Charles had "admitted to me that of that $100,000, approximately $12,000 was used to paint the apartments and house, and to put [on] a new roof," while "[t]he balance of the monies was used to pay personal obligations of Charles Hammer and his wife . . . ."

8

On January 23, 2012, Steven filed a reply to Michael's objections. In his reply, Steven asserted, for the first time in the litigation, that Michael was obligated to file a "creditor's claim" pursuant to the Probate Code "[a]s a condition precedent to obtaining any type of judgment or off-set" against Charles' Estate. However, Steven argued this was required with respect to only "Michael's claims against Charles B. Hammer *as to personal property* . . . ." (Italics added.) With respect to the "claims directly related to [the Burbank Property]," Steven argued his accounting demonstrated "that $100,000 of the line of credit was used for the support maintenance and care of [Carol]." Steven's reply did not address the $29,000 in life insurance proceeds.

5. *Steven Expressly Maintains that the Trial Court Has Authority to Render a Judgment on the Claims Related to the Burbank Property*

On April 3, 2012, a status conference was held after the parties submitted their accounting briefs. Because the parties had not provided memoranda of points and authorities with their accountings, the trial court expressed concern about the rules of law that it should apply in rendering a judgment on the parties' disputed claims concerning the line of credit. In response to the court's concerns, Steven's counsel maintained that "[t]he court has the authority to allocate the indebtedness to each party based on the expenditures" set forth in their accountings. The court ordered the parties to file memoranda of points and authorities addressing the legal rules governing the allocation of encumbrances on the Burbank Property and other matters submitted for the court's resolution.

In response to the court's order, Steven filed a memorandum asserting that "the court has broad authority in this matter . . . to render it's [*sic*] decision based on the stipulated accountings." (Some capitalization omitted.) Steven acknowledged that "[t]he court has broad authority in the partition action" to order, among other things, " 'allowance, accounting, contribution or other compensatory adjustment among the parties according to the principles of equity.' " (Quoting Code Civ. Proc., § 872.140.) And, Steven maintained, "[t]he court has wide latitude . . . to resolve the claims of the parties, as the parties have indeed stipulated herein." Thus, Steven stated, "it is within the

9

power of this Court to render its decision based upon the accountings of the parties and prior stipulation herein."

On June 22, 2012, the trial court entered judgment on the parties' stipulation and accountings. The judgment confirmed the sale of the Burbank Property and provided that the sale proceeds were to be applied to pay off the Wells Fargo line of credit. The remaining proceeds were to be distributed to Charles' Estate and Michael in equal shares after applying the following surcharges.

The judgment ordered Charles' Estate to be surcharged as follows: (1) surcharge of $87,273 plus 10 percent interest from June 2005 for the $100,000 line of credit advance; (2) surcharge of $29,000 plus 10 percent interest from June 15, 2004 for the Anchor National Life Insurance policy disbursements; and (3) surcharge of $40,000 for rent at the Burbank Property, calculated at a rate of $1,600 per month for 25 months.

In relevant part, the judgment ordered Michael to be surcharged and not surcharged as follows: (1) surcharge of $90,000 plus 10 percent interest from January 1, 2008 for the $90,000 line of credit advance; (2) no surcharge for the $52,000 line of credit advance based on the court's finding that the "evidence presented revealed the amount was distributed to grandchildren as desired by Carol Hammer"; (3) no surcharge for the 2001 Chevrolet van based on the court's finding that "the subject vehicle was given [to Michael] as an accommodation to assist Carol Hammer"; and (4) surcharge of $24,000 for rent at the Burbank Property, calculated at a rate of $1,600 per month for 15 months.

### CONTENTIONS

Steven, as executor of Charles' Estate, contends that portions of the judgment should be reversed on the following grounds: (1) the trial court lacked jurisdiction to surcharge Charles' Estate for any sums because Michael did not file a creditor's claim after Charles' death as prescribed by the Probate Code; (2) the surcharges against Charles' Estate were not supported by substantial evidence; (3) the trial court's decision not to surcharge Michael for the 2001 Chevrolet van was not supported by substantial evidence; and (4) the court's decision not to surcharge Michael for the $52,000 line of credit advance was not supported by substantial evidence.

10

Contrary to Steven's contention, the failure to file a creditor's claim is not jurisdictional, and we hold that Steven forfeited this objection by failing to preserve it in the trial court. We further find that the surcharges against Charles' Estate were supported by substantial evidence. We likewise find that substantial evidence supported the trial court's decision not to surcharge Michael for the 2001 Chevrolet van. However, we agree with Steven that the trial court's underlying basis for its decision not to surcharge Michael for the $52,000 line of credit advance—that these funds were "distributed to grandchildren as desired by Carol Hammer"—was not supported by substantial evidence. Because it was undisputed that Michael took these funds and distributed them in a manner not authorized by Carol or her Trust, we will reverse and modify that portion of the judgment to order a surcharge of $52,000 plus interest against Michael. In all other respects, the judgment is affirmed.

## DISCUSSION

1. *Steven Forfeited Any Claim of Error Based on Michael's Purported Failure to File a Creditor's Claim*

Probate Code section 9370, subdivision (a), provides that an "action or proceeding pending against the decedent at the time of death may not be continued against the decedent's personal representative unless all of the following conditions are satisfied:" (1) a claim is filed against the estate; (2) the executor rejects the claim; and (3) within three months after the claim is rejected, the plaintiff moves to substitute the personal representative into the pending action. Subdivision (b) states that "[n]o recovery shall be allowed in the action against property in the decedent's estate unless proof is made of compliance with this section."

Relying on subdivision (b), Steven contends that Probate Code section 9370's claim requirement is "jurisdictional." Because Michael did not file a claim against Charles' Estate within the time prescribed by Probate Code section 9100, subdivision (a), Steven maintains that the trial court "acted in excess of its jurisdiction and/or abused its discretion by surcharging any amounts against Charles' Estate." The case law does not support Steven's contention.

11

Contrary to Steven's jurisdictional argument, "[c]ourts have held that in some limited circumstances the time requirement for filing a creditor's claim can be waived or the estate may be estopped from relying on it when the decedent's representative has induced a creditor not to file a timely claim." (*Dacey v. Taraday* (2011) 196 Cal.App.4th 962, 978 (*Dacey*), citing *Varney v. Superior Court* (1992) 10 Cal.App.4th 1092, 1101-1102; *Satterfield v. Garmire* (1967) 65 Cal.2d 638, 645; *Katz v. A. J. Ruhlman & Co.* (1945) 69 Cal.App.2d 541, 545; *Estate of Sturm* (1988) 201 Cal.App.3d 14, 18.) In *Dacey*, the court held that the appellant estate waived any claim of error based on the plaintiff's failure to file a timely creditor's claim by failing to "sufficiently [preserve] [the issue] as an *independent basis* for rejecting [the plaintiff's] breach of contract claim." (*Dacey*, at p. 978.) In doing so, the court rejected the estate's contention that "it could raise this issue for the first time on appeal because [the plaintiff's] failure to file a claim represents an incurable defect . . . ." (*Ibid.*)

The *Dacey* court's holding follows a line of Supreme Court cases recognizing that "a judgment would not be void" for failure to prove that a creditor's claim was presented to an estate's executor; rather, "[s]uch a judgment would be erroneous only, and would not be reversed even on appeal, unless the objection was first made in the trial court." (*Falkner v. Hendy* (1895) 107 Cal. 49, 52-53; see also *Bank of Stockton v. Howland* (1871) 42 Cal. 129, 134; *Drake v. Foster* (1877) 52 Cal. 225, 227; *Burmester v. McNear* (1919) 42 Cal.App. 527, 530 [estate waived objection that complaint failed to allege presentation of a creditor's claim where "proper objection was not made in the trial court, and under [*Falkner v. Hendy*; *Bank of Stockton v. Howland*; and *Drake v. Foster*], such objection may not be made for the first time upon appeal"].) This line of authority recognizes that "[t]he defense that suit was commenced before the presentation and rejection of claim 'is simply matter of abatement—a defense which is not favored, and must be made by plea, and in proper time, or it is waived.' " (*Radar v. Rogers* (1957) 49 Cal.2d 243, 250, quoting *Bemmerly v. Woodward* (1899) 124 Cal. 568, 574-575.)

Consistent with these authorities, we hold that Steven forfeited his objection based on Michael's purported failure to present a creditor's claim. As we noted in our procedural

background discussion, Steven raised Probate Code section 9370's claim requirement only once in the trial court proceedings—in his reply brief to Michael's objections to his accounting. But there, Steven directed his objection at "Michael's claims against Charles B. Hammer *as to personal property* belonging to Michael and/or [Carol]" only. (Italics added.) Those "personal property" claims, which were asserted in Michael's cross-claim and raised again in his objections, related to jewelry, photographs, fine china, artwork and coin, animated cell, and comic book collections. With respect to Michael's claims pertaining to the $100,000 line of credit advance and other financial obligations "directly related to [the Burbank Property]," Steven did not contend or suggest that Michael was required to file a creditor's claim to maintain those pending cross-claims against Charles' Estate. Rather, Steven challenged these cross-claims by pointing to his accounting, which he argued "provide[d] an explanation, supported by tax records and receipts, that $100,000 of the line of credit was used for the support maintenance and care of [Carol]." Steven's reply brief did not adequately preserve this objection for appeal.[5]

---

[5] Indeed, Steven's reply brief did not establish that Michael was under an obligation to file a creditor's claim, because Steven failed to submit evidence to the trial court demonstrating that Michael received proper notice as required by the Probate Code. Under the Probate Code's "nonclaim" provisions, a "creditor's duty to file a claim is not triggered unless the personal representative gives proper notice." (*Clark v. Kerby* (1992) 4 Cal.App.4th 1505, 1508.) In addition to notice by publication as required by Probate Code sections 8003, subdivision (b), and 8120, the personal representative also is required to "give notice of administration of the estate to the known or reasonably ascertainable creditors of the decedent." (Prob. Code, § 9050.) Notice to known creditors must be given by mail as provided in Probate Code section 1215 or, alternatively, the notice may be given by personal delivery under Probate Code section 1216. In support of the contention in his reply brief that Michael failed to file the requisite creditor's claim, Steven submitted only a "Case Summary" of the probate proceeding for Charles' Estate. That Case Summary does not establish that Steven provided notice to Michael as prescribed by Probate Code section 9050. Based on the record provided by Steven, we cannot say that the trial court erred by failing to find that Michael's action was barred by the Probate Code's nonclaim provisions. (See *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 ["a party challenging a judgment has the burden of showing reversible error by an adequate record"].)

13

Moreover, subsequent to filing his reply brief, Steven expressly maintained that the trial court was authorized to rule on Michael's cross-claims related to the line of credit, notwithstanding Steven's contention that Michael's cross-claims related to "personal property" were barred under Probate Code section 9370. At a hearing prior to the trial court's decision on the surcharges, Steven's counsel unequivocally affirmed that "[t]he court has the authority to allocate the indebtedness to each party based on the expenditures" set forth in their accountings. Then, in response to the court's request for briefing concerning the legal rules to be applied in making the requested allocation, Steven filed a memorandum acknowledging that "[t]he court has broad authority in the partition action" to order, among other things, " 'allowance, accounting, contribution or other compensatory adjustment among the parties according to the principles of equity.' " (Quoting Code Civ. Proc., § 872.140.) Steven confirmed, again in his memorandum, that "it is within the power of this Court to render its decision based upon the accountings of the parties and prior stipulation herein."

In the proceedings below, Steven never suggested that it would be error for the trial court to render a judgment on Michael's cross-claims concerning the Burbank Property. Steven stipulated to the process adopted by the trial court and affirmed the trial court's authority to order the surcharges, notwithstanding Michael's purported failure to file a timely creditor's claim against Charles' Estate. Steven forfeited his objection by failing to preserve it in the trial court.

2.      *The Surcharges Against Charles' Estate Are Supported by Substantial Evidence*

Steven also contends that the surcharges against Charles' Estate were not supported by substantial evidence. In doing so, Steven asks us to disregard the evidence submitted by Michael as "unsubstantiated" and insufficient to support the trial court's factual findings. In essence, Steven maintains that the evidence permitted only one possible inference—that, under Charles' stewardship, Carol's financial obligations were incurred solely for her welfare, support and maintenance and not for Charles' personal benefit. The record presented by Steven does not compel this conclusion.

14

" 'A judgment or order of the lower court is *presumed correct . . .* and error must be affirmatively shown. . . .' [Citations.]" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) " 'In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment. [Citation.] All issues of credibility are likewise within the province of the trier of fact. [Citation.] "In brief, the appellate court ordinarily looks only at the evidence supporting the successful party, and disregards the contrary showing." [Citation.] All conflicts, therefore, must be resolved in favor of the respondent. [Citation.]' . . . [Citation.]" (*In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272, 278-279.)

"When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Estate of Arstein* (1961) 56 Cal.2d 239, 240.) "When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Primm v. Primm* (1956) 46 Cal.2d 690, 694.)

"Substantial evidence, of course, is not synonymous with 'any' evidence, but is evidence which is of ponderable legal significance. It must be 'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.] Thus, the focus is on the quality, not the quantity of the evidence. Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be 'insubstantitial.' [Citation.]" (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871-872 (*Toyota Motor*).)

With these principles in mind, we address Steven's sufficiency of the evidence challenges to the surcharges against Charles' Estate.

a.     *The line of credit surcharge*

In challenging the $87,273 surcharge related to the $100,000 line of credit advance, Steven largely relies upon the accounting he submitted to the trial court, which he contends

15

"clearly prove[s] that Carol's expenses were well in excess of her income and that additional monies totaling approximately $90,000 were expended for Carol's welfare, support and maintenance." Steven's accounting, whether standing alone or considered within the context of all the evidence presented to the trial court, does not compel this conclusion.

To begin, as Michael points out, the accounting "does not tie" Carol's expenses to the $100,000 line of credit advance, nor does it establish how or when the funds from this advance were spent. Notably, Steven's accounting relies upon expenses reflected in Carol's 2006 and 2007 tax returns; however, the evidence showed that Charles was relieved of responsibility for managing Carol's finances in June 2006. Presumably, the entire $100,000 advance had been spent before that time, making part of the 2006 and all of the 2007 expenses largely irrelevant.

Indeed, Michael testified, in his declaration under penalty of perjury, that Charles admitted the entire $100,000 advance had been spent prior to Michael taking control of Carol's finances.[6] According to Michael's testimony, Charles admitted that "approximately $12,000 was used to paint the apartments and house, and to put [on] a new roof," while "[t]he balance of the [$100,000] was used to pay personal obligations of Charles Hammer and his wife . . . ." Michael also referred to Carol's 2006 tax returns, which showed expenditures for painting, roofing and other improvements totaling $12,727. Based on this evidence, Michael asserted that $87,273 ($100,000 less the $12,727 expenditure) should be surcharged against Charles' Estate.

The trial court appears to have found Michael's testimony credible, and Steven has not presented us with a record to disturb that determination on appeal.

---

[6] The record reflects that Steven stipulated to the trial court making credibility findings based on the parties' submissions in lieu of live testimony. At the final hearing before the trial court entered its judgment, the court confirmed with the parties that they were stipulating to the court making "findings of fact" and "credibility determinations" based on the "declarations and exhibits" that had been submitted. The parties confirmed this was the stipulation.

16

b.    *The life insurance surcharge*

For much the same reason, we reject Steven's challenge to the $29,000 surcharge for the amounts distributed in 2003 and 2004 from Carol's Anchor National Life Insurance policy. Steven contends this surcharge was based solely on Michael's "belief" that Charles misappropriated these funds for his own personal benefit. However, the evidence was undisputed that these funds were distributed from Carol's insurance policy during the years in which Charles was living with Carol and in charge of her finances. After Michael presented evidence of these distributions, Steven did not attempt to rebut Michael's contention or to account for the disposition of these funds. Based on the timing of the distribution, the trial court could reasonably infer that Charles used the insurance proceeds for his personal purposes.

c.    *The rent surcharge*

Steven contends there was no basis for the $40,000 surcharge for rent because "it was Carol's intent that Charles be compensated for his services by providing him and his wife with room and board." However, the trial court appears to have determined that neither brother should be compensated for the care they provided to their ailing mother. This is borne out by the trial court's decision to surcharge Michael for the $90,000 line of credit advance, to which he claimed entitlement as compensation for the care he provided his mother. It also is demonstrated by the trial court's decision to surcharge Michael for the months he lived in the Burbank Property rent-free. Given the trial court's broad discretion in a partition action to "order allowance, accounting, contribution, or other compensatory adjustment among the parties according to the *principles of equity*" (Code Civ. Proc., § 872.140, italics added), we cannot say the court erred by refusing to compensate these brothers for the care they provided to their 98-year-old mother.

The evidence showed that Charles and his wife moved into the Burbank Property in 1996 and lived there rent-free until at least 2006—far in excess of the 25 months for which the trial court surcharged Charles' Estate. Michael also asserted that rent for the Burbank Property was $1,600 per month—an assertion supported by the rental income reported on Carol's tax returns. Based on this record, we find no error in the trial court surcharging

17

Charles' Estate $40,000 in rent for the years Charles and his wife lived at the Burbank Property.

3.      *The Decision Not to Surcharge Michael for the 2001 Chevrolet Van Is Supported by Substantial Evidence*

In challenging the trial court's determination with respect to the 2001 Chevrolet van, Steven concedes that "[a] surcharge would have been totally inappropriate given the fact that Charles voluntarily gave the vehicle to Michael . . . ." Nevertheless, Steven maintains that "Charles' Estate is entitled to a credit for the vehicle." The distinction between a "credit" and a "surcharge" in this case is one without difference. In the zero-sum game the brothers chose to play over the distribution of their mother's estate, a credit to Charles is the equivalent of a surcharge to Michael. Steven acknowledges that "Charles willingly gave the vehicle to Michael so that Michael could visit and spend time with Carol." The trial court did not error in refusing to surcharge Michael for this gift.

4.      *The Decision Not to Surcharge Michael for the $52,000 Line of Credit Advance Is Inconsistent with the Undisputed Evidence*

Finally, Steven contends the trial court erred "when it failed to surcharge Michael for the $52,000" line of credit advance, because Michael admitted "that he did not use the money for Carol's welfare, maintenance or support, but used it for his own purposes." On this point, we agree. Based on Michael's assertion that Carol's Trust authorized him to distribute the funds to Carol's grandchildren, the trial court determined that no surcharge should be applied, because the "evidence presented revealed the amount was distributed to grandchildren as desired by Carol Hammer." (Underscoring omitted.) However, the Trust document establishes, as an undisputed fact, that Michael was not authorized to make distributions from Carol's trust estate to her grandchildren. Accordingly, we will reverse and modify this portion of the judgment.

18

As we previously noted, "[w]here conflicting inferences may reasonably be drawn, the determination of the trial court will be accepted on appeal even though a contrary determination would likewise be upheld." (*Toyota Motor*, *supra*, 220 Cal.App.3d at p. 872.) "However, where the facts are undisputed, the issue is one of law and the appellate court is free to reach its own legal conclusion from such facts." (*Ibid*.) " 'When the record clearly demonstrates what the trial court did, we will not presume it did something different.' [Citation.]" (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1550.)

There is no dispute, indeed Michael admits, that Michael drew $52,000 from the line of credit and transferred those funds to his personal bank account in January 2008. In his declaration, Michael testified that the funds were originally taken to make necessary improvements to his home in anticipation of Carol moving in with him. But when Carol's condition worsened, Michael admits that he abandoned the plan and left the money in his account until Carol's death. Thereafter, Michael testified that the funds were "distributed to the grandchildren of Carol Hammer, *pursuant to her trust*." (Italics added.) To substantiate this testimony, Michael presented checks and money orders showing distributions to his children (Carol's grandchildren) totaling $30,000. Michael did not account for the remaining $22,000.

In its written judgment, the trial court determined that Michael should not be surcharged for the $52,000 because the "evidence presented revealed the amount was distributed to grandchildren *as desired by Carol Hammer*." (Underscoring omitted, italics added.) The only evidence supporting this conclusion was Michael's testimony that the distribution was made to the grandchildren "pursuant to [Carol's] trust." The trial court's finding and Michael's testimony are inconsistent with the undisputed terms of the Trust.

With respect to the distribution of Carol's trust estate, the Trust unambiguously provides: "I CAROL VIRGINIA HAMMER upon my death give the *entirety of the estate*, whether real, personal or mixed and wheresoever situated and whether owned by me now or hereafter acquired of which I may be possessed *to my children CHARLES B. HAMMER and MICHAEL K. HAMMER equally, share and share alike*." (Italics added.)

19

Because the undisputed facts permit only one conclusion—that Michael distributed the $52,000 in a manner not authorized by Carol or her Trust—we will reverse and modify the judgment to surcharge Michael for this amount plus interest.

## DISPOSITION

The portion of the judgment denying a surcharge of $52,000 against Michael is reversed and the matter is remanded to the trial court with directions to modify the judgment to surcharge Michael for $52,000 plus 10 percent interest from January 1, 2008. On remand, the trial court is further directed to calculate the total surcharges plus interest to be charged against each party, to offset such amounts, and to enter judgment against the party having a remaining surcharge. The judgment is affirmed in all other respects. In the interest of justice, the parties shall bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

CROSKEY, Acting P. J.

ALDRICH, J.

20